In the Matter of the Honorable Joan KOUROS, Judge of the Lake Superior Court, Criminal Division 3.

No. 45S00–0309–JD–409.

Supreme Court of Indiana.

Oct. 12, 2004.

Kevin P. McGoff, Indianapolis, IN, Stanley W. Jablowski, Merrillville, IN, Attorneys for Respondent Hon. Joan Kouros.

Meg W. Babcock, Thomas M. Carusillo, Indianapolis, IN, Attorneys for The Commission on Judicial Qualifications.

JUDICIAL DISCIPLINARY ACTION

PER CURIAM.

### Introduction

The Indiana Commission on Judicial Qualifications ("Commission") has brought a disciplinary action in this Court under Article 7, Section 4 of the Indiana Constitution against Judge Joan Kouros, Judge of the Lake Superior Court, Criminal Division 3. It has asked for her removal.

The evidence demonstrates that over a substantial period of time, involving a large number of litigants, Judge Kouros has proved either unable or unwilling to issue timely and documented decisions in the cases assigned to her, causing real-life consequences for those whose matters are in her hands. Moreover, her representations to us about measures taken to conduct the court's business in accord with acceptable standards have proven unreliable. We therefore conclude that removal from office is the appropriate outcome.

### Factual and Procedural Background

Judge Kouros ("Respondent") was appointed to the bench in 1997. During 1999–2001, Respondent pronounced sentence orally in at least thirty-five felony cases in which she failed to issue a written

order of sentencing promptly.[1] Most of the delays between the pronouncement of sentence and the order lasted between a few weeks to a few months. Five of the cases involved delays of five to six months; one involved delay of ten months; three involved delays of fourteen or fifteen months; and one involved a delay of twenty-seven months. In a few cases, the chronological case summary ("CCS"), in which the trial court clerk records the judicial events in a case, does not reflect the entry of an order at all. More than a few of the defendants jailed in Lake County during these delays became the subject of incident reports involving fighting and other rule violations. One case involving a fifteen-month delay between in-court sentencing and the issuance of the sentencing order led to a federal lawsuit by the defendant, who claimed that the delay in transferring him to the Department of Correction ("DOC") to serve his six-year sentence deprived him of educational opportunities not available at the jail.

In early 2001, this Court received a report regarding Respondent's backlog. We directed the judges of the Lake Superior Court, Criminal Division, to review the delays, determine whether the circumstances were symptomatic of a long-term problem, report whether a large-scale problem existed, and, if so, submit a plan for addressing it. *See* Stipulated Exhibit 4 (*In re Administration of Lake Superior Court, Criminal Division*, No. 94S00–0101–MS–823, order (Jan. 22, 2001) ("MS–823")).[2] On February 5, 2001, Senior Judge Maroc, on behalf of the judges of the Criminal Division, represented that there were 330 files in Respondent's office awaiting the entry of orders and return to the clerk's office.

The four Criminal Division judges, including Respondent, signed a report to this Court, filed February 16, 2001, stating, "[T]he presiding judge [i.e., Respondent] has initiated a new method of transcribing and processing docket entries contemporaneously with the making of said entries in open court, so that the backlog dilemma should not occur in the future." Stip. Ex. 8. But the transcription equipment being referred to was not actually installed until nearly two years later in February 2003.

In January 2002, an inquiry by the Commission into delays in the Respondent's court resulted in the Commission's counsel writing the Respondent and reminding her of the importance of "housekeeping" in her court. Counsel also warned that an appearance of disarray leaves the impression that the court's docket is in a similar state and that Respondent needed to address that issue to avoid criticism and concern over the management of the court. Stip. Ex. 9. In February 2002, counsel wrote to Respondent again and advised her that although the Commission's inquiry was being dismissed without prejudice, the Commission would reopen the matter if the problem recurred and advised Respondent to "maintain scrupulous attention to the processing of cases and … not allow your office to appear to be in disarray." Stip. Ex. 10.

---

1. Indiana Criminal Rule 15.1 provides that the court "shall promptly prepare and sign the judgment[.]" When a convicted person is sentenced to imprisonment, "the court shall, without delay, certify, under the seal of the court, copies of the judgment of conviction and sentence to the receiving authority." Ind.Code § 35–38–3–2(a) (West 1998). Be-

cause the parties' stipulation and the masters' findings use the term "sentencing order," we will too in this opinion.

2. "MS" case numbers refer to miscellaneous matters on the docket maintained by the Clerk of Courts.

On October 21, 2002, this Court issued an order in MS–823 instructing the Executive Director of the Division of State Court Administration ("DSCA") to monitor Respondent's case processing and report to the Court. On October 24, 2002, DSCA staff visited Respondent's court. There, DSCA observed over 200 files for cases in which hearings or trials had occurred but no corresponding orders or CCS entries had been made. In one, Respondent continued a post-conviction relief hearing, but the defendant was transferred from the DOC for the hearing anyway because no order of continuance was issued. In another, Respondent ordered that a defendant charged with being an habitual offender be held without bond, but Respondent did not reduce the order to writing and the defendant posted bond five days later. In four cases, Respondent authorized bench warrants for the arrest of defendants but failed, for periods ranging from four to eleven months, to transmit the orders to the clerk's office. In three other cases, Respondent had sentenced the defendant but the sentencing order was not issued for several months. Four other cases had assorted orders that were either not signed or not transmitted to the clerk's office for months. DSCA also observed that the surfaces of desks were covered with files, many of which were themselves covered with "post-it" notes documenting the court's decisions.

DSCA soon initiated a proceeding, *In re Administration of Lake Superior Court*, No. 94S00–0301–MS–27 ("MS–27"), under Indiana Trial Rule 63. That rule allows one to petition for appointment of a judge *pro tempore* if the regular judge is unable because of physical or mental infirmity to perform the duties of her office, or fails, refuses, or neglects to perform the duties of office without good cause. On January 17, 2003, we issued an order in MS–27 noting that despite the report previously submitted by the Criminal Division judges, Respondent had not implemented a new method of transcribing and processing papers contemporaneously with the announcement of decisions in open court. Finding an unreasonable delay and backlog in processing cases in Respondent's court, we established a schedule for Respondent to manage the case files in her court. The schedule required Respondent to prepare necessary orders in cases whose files were checked out from the clerk's office, sign those orders, cause entries to be made on the CCS, and return the case files to the clerk by March 6, 2003.

Paragraph 2 of the order required Respondent to take all measures necessary to eliminate her court's backlog problem, including, at a minimum, that she:

a. Institute and continue to use a dictation system for the contemporaneous recording and production of written orders and CCS entries[.]

b. Insure that every order reflects the actual date that is signed by the judge and that each CCS entry reflects the date that such entry was made on the court's computerized case management system. . . .

c. Reduce or cause to be reduced to a written order, within forty-eight (48) hours of its announcement, any decision the court announces during a hearing, a trial, or in any other matter before the court. Judge Kouros shall sign such order and make or cause an appropriate entry to be made in the Chronological Case Summary of the case.

d. Transmit or cause to be transmitted to the Clerk of the Lake Superior Court, a written order reflecting any decision announced in open court. Such order shall be transmitted

within twenty-four (24) hours in the vast majority of cases, or within a maximum of forty-eight (48) hours in all cases.

e. Return or cause to be returned to the Clerk of the Lake Superior Court, within forty-eight (48) hours of being signed out, any file of a case existing in Criminal Division III on which a decision has been announced in open court.

f. Ensure that no more than eighty (80) files are checked out from the Clerk of the Lake Superior Court to Criminal Division III at any given time.

Stip. Ex. 13. Paragraph 3 of the order required Respondent to certify to this Court in a written report no later than March 15, 2003, the specific actions she took to assure that the case backlog problem was eliminated. Finally, the order provided that the Court would review the matter in the future to determine whether further action was warranted.

On March 4, 2003, Respondent filed a report with this Court certifying, among other things, that "each and every minimum standard set out in Paragraph 2 [of the order] has been and will continue to be followed" and "every effort will be made to process cases in the manner outlined in this Court's order." Stip. Ex. 14.

On April 21, 2003, DSCA visited the Respondent's court again and found approximately 171 case files checked out from the clerk's office to Respondent's court, exceeding the ordered limit of eighty. During its visit, DSCA learned that as of March 4, 2003 (when Respondent filed her report certifying compliance with the January order), Respondent still had, contrary to this Court's order, possession of eleven files that had been checked out from the clerk's office in January or February 2003. DSCA also found thirteen cases in which Respondent had signed orders but not returned the files to the clerk's office within forty-eight hours and several cases in which sentencing orders were not timely issued.[3]

---

**3.** Those orders (entered in 2003 unless otherwise indicated) included: 1) an April 1 discovery order not transmitted to the clerk's office until April 21; 2) a March 26 order directing action on a notice of appeal, not transmitted to the clerk until April 21; 3) orders on February 11 accepting a plea agreement and imposing sentence and on March 11 requiring payment of a public defender fee, which were not transmitted to the clerk until April 7; 4) a February 26 order revoking probation, which was not transmitted to the clerk until April 7; 5) a February 19 order requiring the completion of additional community corrections hours, not transmitted to the clerk until April 21; 6) October 24, 2002 orders entering a conviction and discharging a defendant from probation, not transmitted to the clerk until April 21, 2003; 7) a February 26 order allowing withdrawal of a petition to revoke probation and releasing a defendant, not transmitted to the clerk until April 21; 8) a February 27 order discharging a defendant from probation, not transmitted to the clerk until April 21; 9) a March 4 order revoking probation and an April 1 sentencing order, which were not transmitted to the clerk until April 21; 10) a March 28 sentencing order not transmitted to the clerk until April 21; 11) a June 14, 2002 order extending probation not transmitted to the clerk until April 21, 2003; 12) a March 7 order striking a contempt finding not transmitted to the clerk until April 21; 13) a March 13 order granting a continuance to April 11, which was not entered on the CCS or transmitted to the clerk until April 21; 14) a January 31 sentencing of a defendant to a suspended term of 18 months that should have resulted in release but for Respondent's failure to issue a timely sentencing order, resulting in the defendant remaining in jail until released by another judge on February 5; 15) a March 4 sentencing that was not reduced to an order until April 8; and 16) a January 7 sentencing that was not reduced to an order until February 14. *See* Masters' Findings, pp. 25–28.

On May 14, 2003, DSCA requested under MS–27 that this Court issue an order that Respondent appear and show cause why a judge *pro tempore* should not be appointed to her court. This Court soon issued the requested order. On June 16, 2003, Respondent filed a response that, among other things, admitted a delay in processing cases that "reflects negatively not only on the Lake Superior Court, Criminal Division 3, but on the bench generally." Stip. Ex. 16. On June 27, 2003, we issued an order in MS–27 finding that Respondent had failed to perform her duties without good cause and that significant improvement in the administration of her court had not been sufficiently demonstrated. Stip. Ex. 17. We appointed a judge *pro tempore* to perform those duties until Respondent's term ended or until Respondent became able to perform those duties. We also explained that after ninety days from the date of the order, Respondent could petition to be allowed to resume the duties of her office.

Senior Judge Kickbush served as judge *pro tempore* during Respondent's suspension. When he assumed the duties of the court, he found several files in the secretary's office that had been checked out from the clerk's office by Respondent's court for years. CCS entries for those cases, Judge Kickbush explained, had not been made; those files had to be reconstructed, a task that the secretary performed by reviewing notes, the court reporter's tapes, and contacting the attorneys on the case. During a visit by DSCA personnel to Judge Kickbush, they discovered storage boxes containing miscellaneous papers from Respondent's office. The boxes contained not only newspapers, magazines, and phone notes, but also the original letter from a defendant whose competency was in question (though the letter had not been noted on the CCS or copied for the defendant's file) and a defendant's original HIV report. Judge Kickbush also discovered two motions for change of judge critical of Respondent's demeanor and/or inability to manage her court, but copies of those motions had not been placed in the case files.

On September 29, 2003, Respondent filed a petition in MS–27 requesting permission to resume her office. In her petition, Respondent represented that she met with the DSCA's Director and discussed with her the importance of recognizing "the specifics of this Court's previous orders." Stip. Ex. 18. Respondent stated that during her suspension, she conferred with fellow judges from around the State to learn more about operating a busy urban court, attended conferences on time and case management, and worked with DSCA to learn how to manage her court. Respondent represented that if reinstated, she would transmit written orders to the clerk's office and return the files to the clerk within forty-eight hours of when the decisions were announced in court and would have no more than eighty files checked out from the clerk at one time. *Id.* Respondent also wrote a letter in support of her request for reinstatement, stating that her "past problems are totally behind [her]." Stip. Ex. 19 (letter to Chief Justice Shepard, Nov. 6, 2003).

On December 12, 2003, we ordered that Respondent would be allowed to resume her judicial duties based upon her conduct during the suspension and her assurances that she would manage her court effectively in the future. Judge Kickbush's service as judge *pro tempore* ended effective December 31, 2003.

Meanwhile, on September 26, 2003, the Commission initiated the present judicial discipline proceeding by filing a Notice of the Institution of Formal Proceedings and

Statement of Charges against Respondent in seventy-eight counts. Respondent filed an answer. On November 19, 2003, this Court appointed three trial court judges to serve as masters and hear and receive evidence. On March 25, 2004, this Court issued an order directing the masters to consider, among other things, Respondent's compliance with the order of January 17, 2003, following her reinstatement. The Court explained that it deemed the issue of post-reinstatement compliance with the January 17, 2003 order as falling within the existing statement of charges. Stip. Ex. 23, p. 2.

Evidence about the post-reinstatement period showed that Respondent's office and bench were in a state of substantial disorder on March 29, 2004. In forty cases in which sentencing hearings were held during the post-reinstatement period, Respondent failed to return files and sentencing orders to the clerk's office within forty-eight hours. The delays ranged from seven days to over two months, with at least half of the forty cases involving delays of two weeks or more. Also during this period, Respondent issued three arrest warrants in cases whose files were not checked back into the clerk's office within forty-eight hours of the warrant's issuance. In another case, charges were dismissed, but the file was not returned to the clerk's office for ten days. Motions for psychiatric examinations were granted in one case on March 12, 2004, but orders remained in the file with the court as of March 29, 2004.

On that same date, nine files with signed orders were found in Respondent's court, having not been returned to the clerk's office within forty-eight hours of when they were checked out. Seven other files in Respondent's court that day had been checked out for weeks or more and contained unsigned orders bearing dates one to three weeks earlier. Respondent's office contained other examples of signed orders dated weeks earlier with no file stamp and orders dated weeks earlier with no signature.[4] Inspections of the clerk's records indicated that, not counting files checked out to magistrates, there were at least 137 files checked out from the clerk's office to Respondent's court on February 24 and March 29, 2004, and 163 checked out to the court on March 26, 2004.

Having received stipulations and documentary evidence and heard testimony on April 22, 2004, the masters filed their Findings of Fact, Conclusions of Law and Recommendation to this Court, as provided by Admission and Discipline Rule 25(VIII)(N)(1). The Commission has filed its Response to Masters' Report and Recommendation of Removal of Respondent along with its Memorandum in Support of Recommendation of Removal of Respondent. Pursuant to the Commission's request that Respondent be suspended pending our review of this matter, we issued an order on July 22, 2004, suspending Respondent from her judicial duties with pay pending the resolution of this matter. *See* Admis. Disc. R. 25(V)(B) (providing for suspension with pay pending review if Commission is seeking removal or retirement of judge). A few days later, this Court appointed a second judge *pro tempore* to perform judicial duties until further Court order. Respondent has filed a Petition for Review opposing her removal. The Commission has filed a reply to that petition.

---

**4.** At the evidentiary hearing, Respondent testified that it was difficult for her to comply with the forty-eight-hour rule, although she acknowledged having made no effort to notify this Court that compliance with the forty-eight hour rule was too difficult to achieve. Masters' Findings, p. 44.

This judicial discipline matter has now been tried, fully briefed, and reviewed by this Court.

### Charged Misconduct

It is the Commission's burden to prove judicial misconduct by clear and convincing evidence. Admis. Disc. R. 25(VIII)(K)(6). We review the masters' findings, conclusions and recommendations *de novo*. Admis. Disc. R. 25(VIII)(P)(4).

The Commission charged Respondent with violating Canons 1, 2, and 3(B)(9) of the Code of Judicial Conduct. Canon 1 provides that a judge shall uphold the integrity of the judiciary, should participate in establishing and maintaining high standards of conduct and "shall personally observe those standards in order to preserve the integrity and independence of the judiciary." Canon 2, which requires a judge to avoid impropriety and the appearance of impropriety, provides in relevant part that a judge "shall respect and comply with the law[ ] and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. . . ." Canon 3(B)(9) states that a judge shall perform the duties of the judicial office diligently, including disposing of all judicial matters fairly, promptly, and efficiently.

The Commission alleged that Respondent violated these Canons and engaged in conduct prejudicial to the administration of justice and willful misconduct in office. *See* Admis. Disc. R. 25(III)(A)(3) and (6) (stating grounds for discipline in addition to violation of canons).

■ Counts 1 through 35 of the Commission's statement of charges were based on Respondent's failure to issue sentencing orders promptly during 1999–2001. Respondent stipulated and the masters found that by these delays, Respondent violated her duty under Canon 3(B)(9) to dispose of judicial matters promptly. We agree and conclude further that by these delays, Respondent committed conduct prejudicial to the administration of justice by not promptly entering sentencing orders.

■ Count 36 was based on Respondent's report to this Court on February 16, 2001, that she had initiated a new method of transcribing and processing entries contemporaneously with the orders stated in open court, when the transcription equipment was not actually installed until February 2003. Respondent admits that when she signed the report to this Court, she was referring to the dictation equipment, the dictation equipment was broken, and "it would have been advisable to have alerted the Supreme Court that the equipment was inoperable[.]" Pet. for Review, p. 6. Although the masters drew no conclusion whether this was misconduct, we conclude that by not providing this Court with full, accurate information in this regard, Respondent violated Canons 1 and 2 and committed conduct prejudicial to the administration of justice.

■ Counts 37 through 49 were based on some of the delayed orders that DSCA personnel discovered during the visit to Respondent's court on October 24, 2002. Respondent stipulated, and the masters found, that by these delays, Respondent violated her duty under Canon 3(B)(9) to dispose of judicial matters promptly. We agree and further conclude that through such delays, Respondent committed conduct prejudicial to the administration of justice. Such prejudice includes, but is not limited to, the unnecessary transportation of a prisoner whose hearing had been continued, the posting of a bond by a defendant who had been orally ordered to be held without bond, and the belated transmission of warrants to the clerk's office for issuance months after they were ordered.

■ In Count 50, the Commission alleged that despite the Commission's caution to her in February 2002, Respondent was still keeping case files in a disorderly manner as of October 24, 2002, including having "post-it" notes documenting court decisions on the outside of court files. The masters concluded that these facts were true and that Respondent's chambers and courtroom were in substantial disarray. Like the masters, we conclude that by allowing her office to return to a state of disarray (a condition about which the Commission had warned her earlier in the year), Respondent violated Canon 2 and committed conduct prejudicial to the administration of justice.

■ Count 51 alleged that Respondent failed to comply with the requirement in this Court's order of January 17, 2003, that she have checked out from the clerk's office no more than eighty case files at one time. Respondent was found to have exceeded that limit on four days: April 21, 2003 (171 files), February 24 and March 29, 2004 (at least 137 files each day), and March 26, 2004 (163 files). The masters determined that Respondent thereby substantially deviated from this Court's order. We agree and conclude that by having such a large number of files checked out from the clerk's office in violation of this Court's order, Respondent violated Canons 1 and 2 and committed conduct prejudicial to the administration of justice.

■ In Counts 52 through 62, the Commission alleged that on March 3, 2003 (the date Respondent certified that she was in compliance with this Court's January 17, 2003 order) she possessed eleven case files in violation of the terms of that order. Respondent stipulated that she possessed those eleven files in violation of this Court's order on the date when she certi-

fied compliance with each standard required by this Court. We agree with the Commission's charge and the masters' conclusion on these counts to the extent that Respondent's inaccurate certification that she was in full compliance with this Court's order when she was not violated Canons 1, 2, and 3(B)(9) and constituted conduct prejudicial to the administration of justice.

Counts 63 through 78 were based on DSCA's April 21, 2003 discovery of numerous cases in which Respondent either failed to issue prompt sentencing orders or signed various orders but failed to comply with this Court's requirement that they be timely transmitted to the clerk's office within 48 hours, all in violation of this Court's order. Respondent stipulated, and the masters concluded, that through such delays, Respondent violated Canon 3(B)(9). The masters also concluded that by failing to prepare, sign and return orders to the clerk's office within forty-eight hours as required by this Court, Respondent committed conduct prejudicial to the administration of justice. We agree and further conclude that such conduct in violation of our order violates Canons 1 and 2.

### Conclusion and Imposition of Sanctions

Upon finding judicial misconduct, this Court may impose a variety of sanctions, including removal from office, retirement, suspension, discipline as an attorney, limitations or conditions on the performance of judicial duties, private or public reprimand or censure, fine, assessment of reasonable costs and expenses, or any combination of these sanctions. Adm. Disc. R. 25(IV). We are not limited by any recommendation that the masters may make concerning the sanction to be imposed.[5] Adm. Disc. R. 25(VIII)(P)(3).

---

5. Here, the masters found grounds for disci-

pline under Admission and Discipline Rule

In mitigation, Respondent demonstrated effort to improve her court-management skills during the prior, approximately six-month suspension. Respondent also presented uncontradicted testimony at the hearing that she was working on weekends. Respondent has a history of public service that predates her assumption of the bench. Her judicial misconduct does not involve any moral turpitude or misuse of the judicial power to satisfy her personal desires or interests. Additionally, Respondent has expressed remorse and apologized.

Respondent was diagnosed with multiple sclerosis twenty years ago and has undergone treatment for it, including several hospitalizations and weekly injections. She also consulted mental health professionals during her first suspension and was diagnosed with obsessive-compulsive disorder for which she has sought and received therapy. The need for Respondent to monitor and manage these conditions may have some mitigating effect. However, that mitigating effect is tempered by 1) the masters' finding that, according to Respondent's own doctors, her health issues do not impact negatively or interfere with her ability to function as a judge; and 2) Respondent's own assertions that her physical condition does not affect her ability to perform as a judge and that delays in the processing of cases have "not been occasioned by [her] inability ... to perform her duties." Stip. Ex. 16; Tr. 252, 310.

At the same time, significant factors weigh against Respondent. Respondent was not a novice to the bench when this misconduct occurred. This misconduct was not isolated but included a persistent failure to perform judicial duties over a substantial period. It involved acts and omissions in Respondent's official capacity rather than her personal capacity. It included certifications to this Court that were not accurate. And, as evident from the factual background, the misconduct affected not only the parties whose cases were heard in Respondent's court but also others interested in the efficient operation of the criminal justice system.

Lesser, non-punitive attempts have failed to bring Respondent's judicial performance to an acceptable level. Before outside intervention, Respondent's colleagues on the bench in the Criminal Division spoke with Respondent about ways of improving her efficiency with case processing, including dictation. Tr. 23–26. They also offered to help with Respondent's caseload by allowing the magistrates to do more of the work in Respondent's court and by taking some of her cases. Tr. 40, 44. Before initiating this judicial discipline proceeding, the Commission made an informal inquiry that concluded in early 2002 when its counsel wrote to Respondent warning her regarding disorder and the appearance of disorder in her court. In two administrative proceedings, MS–823 and MS–27, we called Respondent's attention to her backlog problem and allowed her an opportunity to correct it. In the second, we even provided Respondent with a detailed set of standards to help eliminate the backlog in her cases and prevent it from recurring. Despite the approximately six-month suspension that we ordered in MS–27, Respondent was unable, once reinstated, to perform in accordance with this Court's directives.[6]

25, but they declined to make any recommendation regarding discipline, other than to clarify that they were not recommending disbarment.

6. In her Petition for Review, Respondent suggests that her post-reinstatement failure to comply fully with this Court's order is not altogether her fault because her former secretary retired and she was without a new secre-

■ In sum, the facts reflect not only Respondent's failure to manage her caseload in accordance with the minimum standards that we provided, but also an inability even to provide accurate information that would allow us to monitor her performance with confidence to ensure that justice is being administered fairly and promptly in her court.

■ We pause to stress that judicial discipline proceedings are designed not simply to punish wrongdoing. Rather, they also help to ensure that judges are fit for judicial duty, restore public confidence in the administration of justice, and preserve the integrity and independence of the judiciary. *See, e.g., In re Kneifl,* 217 Neb. 472, 351 N.W.2d 693, 700 (1984); *In re Rose,* 144 S.W.3d 661, 669, 2004 WL 1294306, *1 (Tex.Rev.Trib.2004); *accord Matter of MacDowell,* 57 A.D.2d 169, 393 N.Y.S.2d 748 (N.Y.A.D.1977) (removal from office was the appropriate sanction where evidence demonstrated judge's unwillingness or inability to discharge his adjudicative and administrative responsibilities diligently).

Balancing all the circumstances, we conclude that protecting the integrity of the judicial system and ensuring the fair and timely administration of justice require that Respondent be removed from office. We therefore order that Respondent be removed from office, effective February 25, 2005. The previously imposed suspension with pay will remain in effect until then. We have postponed the effective date of her removal to February 25, 2005, so that Respondent will not lose her future eligibility for the minimum judicial pension benefits when she reaches retirement age.[7] We conclude that this is appropriate given the Respondent's years of service and the fact that her misconduct reflects, essentially, an inability to carry out the duties of her office rather than moral culpability.

Finally, Admission and Discipline Rule 25(III)(C) provides that a judicial officer removed from office by this Court under an order of discipline, excluding retirement or disability, is ineligible for judicial office and, "pending further order of the Supreme Court, shall be suspended from the practice of law in the State of Indiana." We hereby conclude that Respondent is not to be suspended from practicing law in this State and that she may practice law after her removal from office becomes effective. The costs of the proceeding are assessed against Respondent.

All Justices concur.

---

tary until February 22, 2004. But Respondent has acknowledged that before her new secretary started work, "floater" secretaries shared by the judges of the Criminal Division would come to her court on most days to fill in and that two of the three floaters were experienced employees. Tr. 270. Moreover, as the masters found, Respondent failed to make use of experienced court reporters to assist in keeping up with her judicial duties following her reinstatement, and the court reporters and some of the bailiffs were routinely allowed to leave work early after court hearings, even though they were full-time employees and being paid as such and the court's work was not getting done. Masters' Findings, p. 45; *see* Tr. 298, 315–16.

7. The record shows that Respondent was appointed judge on January 12, 1997. She was sworn in as judge on February 24, 1997. Thus, February 24, 2005, is her eight-year anniversary. The legislature has provided judicial pension benefits for those of retirement age who have at least eight years of service credit. *See* Ind.Code §§ 33–38–8–13 and –14 (West 2004).