ATTORNEYS FOR HON. JUDGE
JAMES DANIKOLAS

Andrew Giorgi
Crown Point, Indiana
Stanley W. Jablonski
Merrillville, Indiana

ATTORNEYS FOR THE COMMISSION ON
JUDICIAL QUALIFICATIONS

Meg W. Babcock
James Maguire
Indianapolis, Indiana

In the

# Indiana Supreme Court

No. 45S00-0403-JD-126

IN THE MATTER OF THE HONORABLE
JAMES DANIKOLAS, JUDGE OF THE LAKE
SUPERIOR COURT, CIVIL DIVISION 3

JUDICIAL DISCIPLINARY ACTION

**December 6, 2005**

**Per Curiam.**

The Indiana Commission on Judicial Qualifications ("Commission") has filed a disciplinary action in this Court against the Respondent, the Honorable James Danikolas, Judge of the Lake Superior Court, Civil Division 3 ("Judge Danikolas"). Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give this Court original jurisdiction over this matter.

The Commission charged Judge Danikolas with violating Canons 1, 2, 2(B), 3(B)(2), and 3(C)(1) of the Code of Judicial Conduct by discharging Kris Costa Sakelaris ("Magistrate Sakelaris") from employment as a Lake Superior Court Magistrate in retaliation for testimony she provided during a previous disciplinary matter brought against Judge Danikolas. The present matter was tried before three Indiana trial court judges appointed to serve as masters in this

proceeding.[1] *See* Ind. Admission & Discipline Rule 25(VIII)(I). Following the trial, the masters filed their "Report of Findings of Fact, Conclusions of Law, and Recommendation" (hereinafter "Masters' Report") with this Court, as provided by Admission and Discipline Rule 25(VIII)(N)(1). Thereafter, the Commission filed its Recommendation; Judge Danikolas filed a Verified Petition for Review, Response to the Commission's Recommendation, and Brief; and the Commission filed a Reply.

The matter has been tried, fully briefed, and reviewed by this Court. Having considered the evidence and submissions of the parties, along with the Masters' Report, we concur with the masters that the Commission has proven by clear and convincing evidence that Judge Danikolas committed judicial misconduct. Further, we concur in and adopt the masters' recommendation that Judge Danikolas be suspended for sixty days without pay.

## Factual Background

The instant case traces its beginning to 2002 and 2003, during which the Commission investigated and prosecuted a judicial disciplinary proceeding alleging that Judge Danikolas entered an *ex parte* order in a marital dissolution case. The Lake Superior Court had dissolved the marriage of J.D. ("husband") and M.D. ("wife") in 2000, at which time husband owed $88,400 in spousal maintenance and child support. The court reduced this amount to a judgment.

Wife eventually initiated proceedings supplemental, saying husband had paid nothing on the judgment. Magistrate Sakelaris conducted a hearing in June 2000, after which she ordered husband to provide wife's lawyer with documentation about income tax returns, an insurance policy, and debt on a vehicle. She also ordered him to begin making payments of $300 per month. Judge Danikolas counter-signed the order. *See generally* In re Danikolas, 783 N.E.2d 687 (Ind. 2003) (hereinafter "Danikolas I").

---

[1] The masters in this matter were the Honorable Michael P. Scopelitis, Judge of the St. Joseph Superior Court; the Honorable Lynn Murray, Judge of the Howard Circuit Court; and the Honorable David A. Shaheed, Judge of the Marion Superior Court. We express our appreciation and gratitude to these judges for their commendable service in this matter.

2

Several months later, wife sought a contempt citation, alleging that husband had neither provided any of the financial information nor paid the monthly amounts ordered. On January 31, 2001, Magistrate Sakelaris heard evidence and arguments by counsel for both parties on these claims. She found husband in contempt for non-payment and for violating the other parts of the earlier order. She held him in contempt and ordered him incarcerated, subject to an escrow bond. Judge Danikolas counter-signed this order as well.

Five days later, Judge Danikolas signed a form order countermanding the contempt order. As the judge later agreed, someone in husband's attorney's office supplied him with information about the case and faxed to the court the release order. He signed it without listening to any tapes or reviewing any transcripts of the trial and without notifying wife's lawyer or giving her lawyer a chance to respond.[2]

It was this *ex parte* action that prompted the disciplinary complaint in <u>Danikolas I</u>. Judge Danikolas's attorney, with the judge present, deposed Magistrate Sakelaris for use in the disciplinary proceeding that led to <u>Danikolas I</u>. During the deposition, conducted on December 20, 2002, Judge Danikolas's counsel repeatedly sought from Magistrate Sakelaris her admission that the contempt order had been improperly entered in light of our decision in <u>Cowart v. White</u>, 711 N.E.2d 523, *on reh'g*, 716 N.E.2d 401 (Ind. 1999). We had observed in <u>Cowart</u> that "[m]any cases state that contempt may not be used to enforce a decree ordering one party to pay the other a fixed sum of money." <u>Id.</u> at 531.

The initial purpose of this line of questioning, Judge Danikolas acknowledged, was to provide justification for his decision to enter the *ex parte* order reversing the contempt. Magistrate Sakelaris, however, would not provide the desired admission and ultimately stated she did not think, even in light of the <u>Cowart</u> opinion shown to her, that she would have ruled differently. At some point in the deposition, Judge Danikolas's attorney threw up his hands and Judge Danikolas left the room. Outside the room, Judge Danikolas angrily commented to

---

[2] Judge Danikolas made these factual stipulations in a Statement of Circumstances and Conditional Agreement for Discipline tendered to this Court in <u>Danikolas I</u>. *See* <u>id.</u> at 688.

3

Magistrate Sakelaris's court reporter, *inter alia*, "Doesn't [Magistrate Sakelaris] realize who her boss is? Doesn't she realize who she works for?"

Whatever Judge Danikolas thought he knew on the day he set aside the contempt he knew only on the basis of unsworn information supplied by the losing party's law firm, information acted upon without affording the party who had won at trial even notice it was occurring much less a chance to be heard. Whether the law and the facts proven in the evidentiary hearing before Magistrate Sakelaris supported a finding of contempt was not at the heart of <u>Danikolas I</u> or of the current judicial disciplinary proceeding.[3] The masters put it this way:

> Whether or not Ms. Sakelaris' January 31, 2001 order violated <u>Cowart</u> or any other law was neither relevant to Judge Danikolas' prior disciplinary proceeding nor is it relevant to this one. Even if Ms. Sakelaris' order was illegal, it could not justify the *ex parte* communication and failure to notify the opposing party that occurred. The validity of that order is not relevant to this proceeding because it has nothing to do with the reason Judge Danikolas fired Ms. Sakelaris. Judge Danikolas did not fire Ms. Sakelaris because she entered that order or because it may or may not have reflected on her knowledge of the law but because she would not say what his attorneys wanted her to say during her deposition. In retaliation for her perceived disloyalty and her failure to "fall on

---

[3] Now, as then, Judge Danikolas has asserted strongly that he was right to free husband, based on <u>Cowart</u>. Of course, our opinion in <u>Cowart</u> cited as authority the earlier decision in <u>Pettit v. Pettit</u>, 626 N.E.2d 444 (Ind. 1993), in which we held that contempt *was* available on child support arrearages reduced to judgment, "at least in respect of unemancipated children," and declared that whether it was available to collect arrearages after emancipation was one on which we "render no opinion." <u>Id.</u> at 446 n.3. Depending on the pleadings, the case history, and the evidence, there are a variety of grounds in which contempt and incarceration may be legally appropriate, such as, to offer one hypothetical, being ordered to pay in proceedings supplemental, having plenty of money to pay, and refusing to do so. We do not know now what the evidence was about husband's ability to pay (not to mention his refusal to provide the various documents ordered), and neither did Judge Danikolas on the day he set aside the order entered at the close of the contempt hearing.

her sword" for the judge, he fired her and then made up fallacious excuses to cover up the real reason for her termination.

(Masters' Rep. at 32, Finding of Fact No. 158.)

Judge Danikolas testified in this case that at the point he left the Sakelaris deposition and spoke to Magistrate Sakelaris's court reporter, he was "concerned that [he] had an employee who didn't know the law." (Comm'n Exh. 1, p. 55, ll. 17-19.) The three masters who heard the evidence for us specifically concluded that his comments were *inconsistent* with a concern that she did not know the law and rather were consistent with "a concern that she had not adequately supported his defense." (Masters' Rep. at 8, Finding of Fact No. 37.) As the masters further found, "Judge Danikolas'[s] subsequent conduct and activities relating to Ms. Sakelaris were as a result of Judge Danikolas' anger and frustration with Ms. Sakelaris' failure to provide helpful testimony." (Id. at 31, Finding of Fact No. 155.)

Judge Danikolas's actions after the deposition support the masters' conclusions. Judge Danikolas never spoke to Magistrate Sakelaris about any problems or issues he had with the performance of her duties generally, with her statements during the deposition specifically, or any concern he had about his ability to trust the legal substance of her orders. He also did not curtail her judicial duties in any way. Instead, on February 12, 2003, eight weeks after the deposition, he assigned all scheduled Civil Division 3 jury trials to Magistrate Sakelaris, which amounted to approximately 20-30 scheduled trials. The following day, Magistrate Sakelaris responded to Judge Danikolas in writing that she "[had] no problem with the reassignment of the jury trials." Then, on May 1, 2003, without any warning or explanation, Judge Danikolas notified Magistrate Sakelaris that she would be discharged effective May 2, 2003.

Sometime after the discharge, Attorney Michael Davis saw Judge Danikolas in the courthouse and asked what had happened to Magistrate Sakelaris. According to Mr. Davis, Judge Danikolas stated something to the effect of, "You've got to have people who are loyal to you, [people] you trust." Judge Danikolas did not mention anything to Attorney Davis about losing confidence in Magistrate Sakelaris's legal abilities or competence as a magistrate.

5

On June 7, 2003, Magistrate Sakelaris filed with the Commission a request for investigation against Judge Danikolas, alleging Judge Danikolas had discharged her in retaliation for her deposition testimony in Danikolas I. On June 27, 2003, the Commission sent Judge Danikolas a Notice of Investigation in which the Commission asked Judge Danikolas, *inter alia*, to provide every basis for his decision to discharge Magistrate Sakelaris. Judge Danikolas responded that he discharged her because "he did not have confidence in her ability to perform the tasks required." Specifically, he stated that following Magistrate Sakelaris's deposition, he "determined that he could no longer counter sign [*sic*] Magistrate Sakelaris'[s] orders without reservation" because he could not "conduct his hearings and monitor her hearings in order to make sure that he is counter-signing [*sic*] a legally correct order."

On March 16, 2004, the Commission filed formal disciplinary charges against Judge Danikolas, alleging he violated the Code of Judicial Conduct by discharging Magistrate Sakelaris in retaliation for her providing truthful but unhelpful deposition testimony in Danikolas I. During the discovery phase of the present case, Judge Danikolas answered interrogatories under oath. One asked him to state without exception each reason for discharging Magistrate Sakelaris. Unlike his response to the same question posed by the Commission on June 27, 2003, this time he listed numerous reasons: (1) Her initial insistence on an employment contract; (2) Her initial refusal to accept assignment of non-domestic relations cases, and subsequent recusals based on alleged knowledge of the parties; (3) Her attendance at local seminars as a representative of the court without Judge Danikolas's knowledge; (4) Her use of the phrase "my court" when speaking in public; (5) Her lack of experience in handling jury trials; (6) Her "operat[ing] her court as if it was separate from [Civil Division] 3 and keeping statistics that were not shared with anyone"; (7) Her deposition, in which she "showed that she was unfamiliar with the collection process" and refused to concede, in the face of applicable precedent, that her "her actions were contrary to law"; and (8) Her repeated failure to set cases at a time certain per his instructions, rather than setting them all at the same time. Judge Danikolas also testified, in an answer to an interrogatory, that he decided to discharge Magistrate Sakelaris "[s]hortly after listening to her deposition on December 20, 2002."

6

At the hearing of this matter, Judge Danikolas essentially repeated these same alleged reasons for discharging Magistrate Sakelaris. His explanation for not providing all of these discharge bases when initially asked by the Commission to do so in June 2003 was, "Life makes it very difficult with coming up with everything, you know."

**Findings With Regard To The Charged Misconduct**

The masters, after reviewing the evidence and the arguments of counsel, found Judge Danikolas's stated reasons for discharging Magistrate Sakelaris were pretexts to cover up the real reason for her discharge, namely her "perceived disloyalty and her failure to 'fall on her sword' for the judge" during her deposition in Danikolas I. (*See* Masters' Rep. at 32, Finding of Fact No. 158.) We concur in their findings. In doing so, we note that in judicial discipline cases, we sit not as a court of appeal but rather as the court of original (and final) jurisdiction. *See* Ind. Const. art. 7, § 4; Admis. Disc. R. 25(I)(A). Therefore, we do not formally employ any deferential appellate "standard of review" to the masters' findings and conclusions and instead review them *de novo*. *See* Admis. Disc. R. 25(VIII)(P)(2). However, in cases involving conflicting testimony and credibility assessments, the masters, like a trial court judge, are best positioned to assess the demeanor of witnesses and judge their credibility. Accordingly, in such cases we give special weight to the masters' findings, particularly when their findings are unanimous.

The heart of the present case turns on what truly motivated Judge Danikolas to discharge Magistrate Sakelaris. This determination necessarily involves significant credibility assessments by the masters concerning what Judge Danikolas did and did not say, did and did not do, and why. Accordingly, we review their findings and conclusions, which were unanimous, with their unique vantage point in mind.

First, the masters found clear and convincing evidence that Judge Danikolas harbored retaliatory animus toward Magistrate Sakelaris from her failure to "fall on her sword" during the deposition. Specifically, he admitted the purpose of the deposition questioning was to provide justification in the disciplinary case against him for his decision to enter an *ex parte* order. When

7

Magistrate Sakelaris did not provide that testimony, he left the deposition angrily stating to Magistrate Sakelaris's court reporter, "Doesn't [Magistrate Sakelaris] realize who her boss is? Doesn't she realize who she works for?" He admitted that the decision to discharge her was made shortly after the conclusion of the deposition, even though he did not actually discharge her until over four months later. Further, sometime after Magistrate Sakelaris's discharge he told a disinterested attorney something to the effect that he had discharged her because "[y]ou've got to have people who are loyal to you, [people] you trust." From this evidence, we concur with the masters that Judge Danikolas harbored retaliatory animus toward Magistrate Sakelaris due to her perceived disloyalty exemplified by her failure to provide mitigating evidence for his defense in Danikolas I, and that this animus motivated his discharge decision.

Second, the masters found clear and convincing evidence that Judge Danikolas, in responding to the allegations against him, provided false non-retaliatory reasons for the discharge to cover up his retaliatory motive. Our review of the evidence confirms the masters' findings of pretext.

We note that Judge Danikolas provided "shifting" reasons for Magistrate Sakelaris's discharge. When asked by the Commission just a few weeks after the discharge to "[p]rovide every basis" for the discharge decision, Judge Danikolas mentioned only his alleged loss of confidence in her legal and judicial abilities that resulted from the December 20, 2002 deposition. Presumably, this articulation was made during the time period when the reasons for her discharge would have been freshest in his mind. Over a year later, after the commencement of formal proceedings against him, he was asked in an interrogatory to "[s]tate without exception each of [his] reasons for terminating Ms. Sakelaris." This time, however, he produced a litany of alleged grievances against Magistrate Sakelaris that purportedly motivated the decision. His only excuse for the discrepancy between the two recitations was that "[l]ife makes it very difficult with coming up with everything, you know." An employer's shifting reasons for a discharge decision can constitute circumstantial evidence of pretext. *See, e.g.*, Cleveland v. Home Shopping Network, 369 F.3d 1189, 1194-95 (11th Cir. 2004); Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1023 (8th Cir. 1998); Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167, *amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996). We find such circumstantial

evidence to exist here, particularly when the "laundry list" of alleged grievances comes in the second, chronologically distant recitation, rather than in the first, relatively contemporaneous recitation.

We also find the masters' exhaustive, detailed review of each of Judge Danikolas's alleged discharge reasons to be persuasive, showing those reasons either had no basis in fact; or, although true, really did not motivate the discharge because they were relatively benign, never mentioned to Magistrate Sakelaris as points in need of correction, and either happened long before her discharge and never resurfaced again or happened closer in time but were affirmatively resolved before the discharge decision was made. *See* Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 147 (2000) (noting that false reasons for an adverse employment action create a reasonable inference that the employer is dissembling to cover up an improper discharge motive); Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 369 (Ind. Ct. App. 1999) (stating pretext is demonstrated when the alleged reasons offered by the employer either have no basis in fact or are found not to be the actual reasons for the discharge). We will not restate the masters' specific findings as to each alleged reason here, but instead state that our own analysis of the record evidence confirmed what the masters found.

## Conclusions And Imposition Of Sanction

A judicial officer may be disciplined for, among other things, "willful misconduct in office," "conduct prejudicial to the administration of justice," and "violat[ing] the Code of Judicial Conduct." Admis. Disc. R. 25(III)(A). With regard to the latter, the Code of Judicial Conduct states that "[a] judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards in order to preserve the integrity and independence of the judiciary." Ind. Judicial Conduct Canon 1. It also requires judges to "respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Jud. Canon 2(A).

Because clear and convincing evidence demonstrates Judge Danikolas discharged Magistrate Sakelaris because of her perceived disloyalty in failing to support the defense the

9

judge had chosen for himself in <u>Danikolas I</u>, we necessarily also conclude that Judge Danikolas knowingly provided "fallacious excuses," (Masters' Rep. at 32, Finding of Fact No. 158), to the Commission and under oath for Magistrate Sakelaris's discharge. Retaliatory discharge and lying to the Commission and under oath constitute willful misconduct and conduct prejudicial to the administration of justice, and violate Canons 1 and 2(A) of the Code of Judicial Conduct.

Specifically, Judge Danikolas's retaliatory discharge of Magistrate Sakelaris constitutes willful misconduct and an abuse of the power of his judicial office to advance a private vendetta, and is prejudicial to the administration of justice. As we noted in <u>In re Boles</u>, 555 N.E.2d 1284, 1288 (Ind. 1990), "The use of judicial power as an instrument of retaliation is a serious violation of the Code of Judicial Conduct." *See also* <u>In re Buchanan</u>, 669 P.2d 1248 (Wash. 1983) (holding judge violated, *inter alia*, Judicial Canons 1 and 2(A) by discharging court employees in retaliation for their participation in the Washington Judicial Conduct Commission's case against the judge).

Further, Judge Danikolas's providing "fallacious excuses" for Magistrate Sakelaris's discharge to the Commission and under oath is prejudicial to the administration of justice, impairs public confidence in the integrity of the judiciary, and constitutes a failure to cooperate with the Commission in the investigation and prosecution of Magistrate Sakelaris's complaint. When a judge prevaricates in a case against him to save his own skin, he impairs his credibility to pass judgment on those who do likewise in cases over which he presides, thereby eroding public confidence in him specifically and in the judiciary generally.

Like many states, Indiana is an employment at will state in which employers may terminate employees without cause, so long as the discharge does not rest on an illegal ground, like race. The Code of Judicial Conduct makes clear that judges are held to a higher standard of conduct. Judge Danikolas's responsibility under the Code does not rise or fall on whether Magistrate Sakelaris succeeds or fails in her civil litigation against Judge Danikolas. "The standard is the [C]ode and it is the particular conduct, not the outcome of the litigation, which determines whether or not there is a violation." <u>In re Wireman</u>, 270 Ind. 344, 351, 367 N.E.2d 1368, 1372 (1977).

"Upon finding judicial misconduct, this Court may impose a variety of sanctions . . . ." *See* In re Kouros, 816 N.E.2d 21, 29 (Ind. 2004); Admis. Disc. R. 25(IV). The masters have recommended Judge Danikolas be suspended from office without pay for a period of sixty (60) days.

In considering an appropriate sanction, we have weighed the damage done to public trust and confidence in the judiciary by Judge Danikolas's use of the power of his office to retaliate against an employee who did nothing but, as the masters found, testify truthfully in a judicial disciplinary proceeding. On the other hand, we have taken into account and given weight to Judge Danikolas's long career of public service and to the multiple occasions on which he has added constructively to the Indiana judiciary. Having considered both the gravity of the misconduct and the mitigation represented by Judge Danikolas's service, we adopt the masters' recommendation as to the sanction to be imposed.

Accordingly, the Respondent herein, James Danikolas, Judge of the Lake Superior Court, is suspended from that office without pay for a period of sixty (60) days. The suspension will go into effect at a date to be decided in consultation among Respondent, Counsel to the Commission, and the Executive Director of State Court Administration, but must commence no later than fifteen (15) days from the date this opinion is certified as final. The costs of this proceeding are assessed against Respondent.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.
RUCKER, J., dissents with separate opinion.

**Rucker, Justice, concurring in part and dissenting in part.**

I agree with the majority that "[t]he heart of the present case turns on what truly motivated Judge Danikolas to discharge Magistrate Sakelaris." Slip op. at 10. And because finding a violation of the Canons at issue here[1] is based in large measure on resolving conflicting testimony and assessing witness demeanor and credibility, I agree there is clear and convincing evidence that Judge Danikolas discharged Magistrate Sakelaris in retaliation for her perceived disloyalty during her deposition in Danikolas I. I write separately however to emphasize that but for Judge Danikolas' position as a judicial officer, his actions in this case would not be sanctionable at all.

Indiana follows the doctrine of employment at will. If there is no definite or ascertainable term of employment, then the employment is at will, and is presumptively terminable at any time, with or without cause, by either party.[2] Wior v. Anchor Industries, Inc., 669 N.E.2d 172, 175 (Ind. 1996); Speckman v. City of Indianapolis, 540 N.E.2d 1189, 1192 (Ind. 1989). See also Sample v. Kinser Ins. Agency, Inc., 700 N.E.2d 802, 805 (Ind. Ct. App. 1998) (Employment of an at will employee may be "terminated by either party at any time for good reason, bad reason, or no reason at all."). This Court has recognized three exceptions to the employment at will doctrine, only one of which is potentially applicable here. We have recognized a public policy exception to the employment at will doctrine if a clear statutory expression of a right or duty is contravened. For example, we have invoked this public policy exception where an employee was discharged for filing a worker's compensation claim, Frampton v. Central Indiana Gas Co., 260 Ind. 249, 297 N.E.2d 425 (1973) (statutorily conferred

---

[1] The Commission on Judicial Qualifications charged Judge Danikolas with violating Canons 1, 2, 2(B), 3(B)(2), and 3(C)(1) of the Code of Judicial Conduct. It is unclear whether "2" is a scrivener's error and the Commission actually intended to charge "2(A)". In any event the masters concluded that Judge Danikolas violated Canons 1, 2(A), and 3(C)(1). And in his papers before this Court, Judge Danikolas makes no claim that the masters found him in violation of a Canon for which he was not charged. Also, although the majority opinion does not say so in express terms, it implicitly has concluded that the findings of the masters support only a violation of Canons 1 and 2(A).

[2] There is no dispute that Magistrate Sakelaris is an employee at will. See Ind. Code § 33-33-45-11 (concerning magistrates appointed for divisions 1, 2, and 3 of the Lake Superior Courts and declaring in relevant part, "A magistrate appointed under this section . . . continues in office until removed by the judge that the magistrate serves.").

right to file a worker's compensation claim), and where an employee was discharged for refusing to commit an illegal act, <u>McClanahan v. Remington Freight Lines, Inc.</u>, 517 N.E.2d 390, 393 (Ind. 1988) (duty not to commit an illegal act for which the employee would be personally liable).

In this case the masters concluded that Judge Danikolas terminated Magistrate Sakelaris' employment because of her "truthful" deposition testimony. Masters' Rep. & Rec. at 34, ¶ 23. Whether characterized as a duty or a statutory right there is no question that a deponent is obligated to testify truthfully. <u>See</u> Ind. Code § 34-45-1-2 ("Before testifying, every witness shall be sworn to testify the truth, the whole truth, and nothing but the truth."); Ind. Trial Rule 30(C) ("The officer before whom the deposition is to be taken shall put the witness on oath . . . ."). But what is the truthful testimony at issue in this case? The findings of the masters are silent on this point. As the masters point out, Judge Danikolas fired Magistrate Sakelaris "because she would not say what his attorneys wanted her to say during her deposition." Masters' Rep. & Rec. at 32, ¶ 158. Taken in context, however, it is apparent that what Judge Danikolas and his attorneys wanted Magistrate Sakelaris to say was that her understanding of applicable law may have been in error and as a result her order of incarceration for contempt may have been wrong or illegal. Testimony refusing to acknowledge error is not susceptible to being proven true or false. It is simply a statement of one's position. And Indiana law does not protect an employee from discharge in retaliation for taking a position different from that of her employer. <u>See, e.g.</u>, <u>Wior</u>, 669 N.E.2d at 177-78 (finding no wrongful discharge where employer fired supervisor for refusing to fire employee who filed a worker's compensation claim).

In essence, by discharging an employee in retaliation for perceived disloyalty and not saying what he wanted the employee to say during a deposition, Judge Danikolas was acting well within the bounds of Indiana law. However, as the majority points out the Code of Judicial Conduct makes clear that judges are held to a higher standard. "The standard is the [C]ode and it is the particular conduct, not the outcome of the litigation, which determines whether or not there is a violation." Slip op. at 15 (quoting <u>Matter of Wireman</u>, 270 Ind. 344, 351, 367 N.E.2d 1368, 1372 (1977)). That Magistrate Sakelaris would likely be unsuccessful in litigating a retaliatory discharge claim under the facts presented here does not absolve Judge Danikolas from liability

2

under the Code.  I am thus compelled to agree that a sanction is appropriate in this case. However, I disagree that suspension from office without pay for sixty (60) days is warranted. This is far too punitive for conduct that otherwise would merit no sanction whatsoever.  In my view a public reprimand is sufficient.  On this issue I respectfully dissent.