ATTORNEYS FOR HON. JUDGE
L. BENJAMIN PFAFF

Kevin P. McGoff
Indianapolis, Indiana
Stephen R. Bowers
Elkhart, Indiana

ATTORNEYS FOR THE COMMISSION ON
JUDICIAL QUALIFICATIONS

Meg W. Babcock
David B. Hughes
Indianapolis, Indiana

In the

# Indiana Supreme Court

No. 20S00-0501-JD-14

IN THE MATTER OF THE HONORABLE
L. BENJAMIN PFAFF, JUDGE OF ELKHART
SUPERIOR COURT NO. 1

JUDICIAL DISCIPLINARY ACTION

**December 13, 2005**

**Per Curiam.**

In this order, we finalize a judicial disciplinary action brought by the Indiana Commission on Judicial Qualifications ("the Commission") against Respondent, the Honorable L. Benjamin Pfaff. At all times relevant to these proceedings, Respondent was the Judge of Elkhart Superior Court No. 1. Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give the Indiana Supreme Court original jurisdiction over this matter.

The Commission's Notice of the Institution of Formal Proceedings and Statement of Charges ("Charges") averred that Respondent, while in office as an elected judge and member of the Indiana Bar, violated Canons 1 and 2 of the Code of Judicial Conduct and engaged in

conduct prejudicial to the administration of justice by: (1) entering a private residence without invitation while searching for his daughter and forcibly grabbing, restraining, and threatening a male at gunpoint while stating something to the effect of, "This M…F… better talk or he's going to die"; and (2) providing false information to a Special Prosecutor's investigator and to the Commission as each investigated the incident. Canon 1 states judges "should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards in order to preserve the integrity and independence of the judiciary." Ind. Judicial Conduct Canon 1(A). Canon 2 states judges "shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Jud. Canon 2(A).

The present matter was tried before three Indiana trial court judges appointed to serve as Masters in this proceeding.[1] *See* Ind. Admission & Discipline Rule 25(VIII)(I)-(K). Following the trial, the Masters filed their "Findings of Fact, Conclusions of Law, and Recommendations to the Indiana Supreme Court" (hereinafter "Masters' Report") with this Court, as provided by Admission and Discipline Rule 25(VIII)(N)(1).

## Findings of the Masters

In sum, the Masters found that the following occurred.

On the evening of Sunday, December 7, 2005, Respondent's fifteen year old daughter left the home where she lived with Respondent's ex-wife. Respondent and his ex-wife searched for her for over twenty-four hours. The search included an incident where Respondent burst into one home where Respondent had been told the daughter could be found, shouting accusations of wrongdoing at the occupants. Later that evening Respondent was told that the daughter could be found at a house occupied by Ashley Snodgrass, a recent high school graduate, her fiancé Shawn

---

[1] The Masters in this matter were the Honorable Steven David, Judge of the Boone Circuit Court; the Honorable Daniel Donahue, Judge of the Clark Circuit Court; and the Honorable Susan Orr Henderson, Judge of the Fountain Circuit Court. We express our appreciation and gratitude to these judges for their commendable service in this matter.

Flores, age 21, 18 year old Bryan Schiltz, and two other males. Respondent and his ex-wife went to the house where only Snodgrass was at home. Snodgrass permitted a search of the home to satisfy the pair that their daughter was not in the home, and promised to call Respondent if the daughter was located.

Snodgrass then reached Flores by phone at his brother's home and was told that Respondent's daughter was also there. Snodgrass requested Flores to return with the daughter, and called Respondent to report that the daughter would be at her house shortly. Respondent and his ex-wife arrived at Snodgrass's house before Flores returned. In the meantime Flores and Schiltz had started to drive the daughter to their home, but the daughter exited the car and ran to a house a few streets before they arrived, claiming that she knew its occupants. Flores and Schiltz continued to their home, intending to report where the daughter could be found.

It was at this point that the testimony of Snodgrass, Schiltz, Flores, Respondent's ex-wife, and Respondent differed. The evidence is undisputed, however, that Respondent confronted Schiltz concerning the whereabouts of Respondent's daughter, used some degree of force to get Schiltz to sit on the loveseat inside the house, and pointed his loaded handgun, which he had brought with him, at Schiltz during the confrontation. The major differences in testimony were between Respondent, on the one hand, and the other four witnesses, on the other. Respondent claimed the gun was produced for only about 3-5 seconds because Respondent, who believed Schiltz was under the influence of drugs and claimed the house reeked of marijuana, made an aggressive move toward his ex-wife. The others, however, all testified that Schiltz made no aggressive move toward anyone, was very compliant and tried to explain to Respondent where Respondent's daughter was, that the house did not smell of marijuana, and that Respondent had pointed the gun at Schiltz unprovoked and kept it pointed at Schiltz, possibly inches from his face, for a much longer period of time while stating something akin to, "If this Mother F----- doesn't start talking he's going to die."

The Masters, after reviewing the evidence and assessing the credibility of the witnesses, found the four Commission witnesses, rather than Respondent, to be more credible. The Masters unanimously found in relevant part:

3

The testimony of Ashley Snodgrass, Shawn Flores, Bryan Schiltz, and Connie Pfaff differed in some respects, including whether Judge Pfaff first confronted Bryan Schiltz on the porch. . . or as he entered his house, when Judge Pfaff's gun was first drawn, how Judge Pfaff maneuvered Bryan Schiltz onto a loveseat, and for how long the gun was pointed at Bryan Schiltz and at what portion of his body. Those differences not withstanding, Ashley Snodgrass, Shawn Flores, Bryan Schiltz, and Connie Pfaff were each credible witnesses to the critical events on the evening of December 8, 2003. . . . [Their] accounts established clearly and convincingly that when Judge Pfaff encountered Bryan Schiltz, he forcibly grabbed and restrained Schiltz and pointed a loaded firearm at his head, that Bryan Schiltz was under Judge Pfaff's control from the initiation of the encounter and did not make any threatening moves, that Judge Pfaff pushed Bryan Schiltz onto a loveseat and continued pointing his gun at him, that Judge Pfaff said to Bryan Schiltz at gunpoint, "This Mother F----- better talk or he's going to die," or words to that effect, and that Judge Pfaff held Bryan Schiltz at gunpoint from a minimum of "thirty to forty seconds" (testimony of Ashley Snodgrass) to "a good minute" (testimony of Shawn Flores) to "three and a half or four minutes" (testimony of Bryan Schiltz) to "five minutes" (testimony of Connie Pfaff).

(Masters' Rep. at 40-41.) They also found that Respondent had been untruthful when he provided a vastly different account to the Special Prosecutor later assigned to investigate the matter and to the Commission when it investigated the judicial complaint lodged against Respondent.

## The Masters' Conclusions and Recommendation

Based on their findings, the Masters unanimously concluded that Respondent "failed to observe high standards of conduct," "failed to preserve the integrity of the judiciary and the public's confidence in its integrity," "failed to respect and comply with the law," and "committed conduct prejudicial to the administration of justice," in violation of Canons 1 and 2 of the Indiana Code of Judicial Conduct and of Indiana Admission and Discipline Rule 25(III)(A)(6).

The Masters then determined the sanction to recommend for these violations. As part of their assessment, the Masters reviewed aggravating and mitigating factors.

In mitigation, the Masters found "that Judge Pfaff had served with distinction as a judge" and that 54 attorneys, educators, public servants, executives, and citizens had submitted letters on his behalf. They also found, as to Count I, that he had acted on December 8, 2003, as a parent out of a legitimate concern for his daughter's welfare. (Masters' Rep. at 42.)

In aggravation, the Masters found, as to both Counts, that Respondent, among other things: (1) showed little or no remorse for his misconduct; (2) instigated a confrontation at another residence earlier on December 8, 2003, when, despite being asked to remain outside by a law enforcement officer, he "barged into another's home and uttered profanities and disrupted the law enforcement officer's investigation"; (3) was untruthful about the confrontation just mentioned; (4) had the opportunity to leave his loaded handgun at his residence before going to the Snodgrass residence but chose not to; (4) was untruthful when he stated under oath and to the Special Investigator that he believed occupants of the Snodgrass residence had engaged in drug use at the residence and that he smelled marijuana therein; (5) failed to "work within the system in the search and recovery of his missing daughter, electing instead to take matters into his own hands"; (6) was unjustified in his use of his handgun on the night of December 8, 2003; (7) demonstrated a pattern on December 8, 2003 of improper activity and showed blatant disregard for the privacy rights of others; and (8) failed to remove himself from a situation he had reason to believe might be confrontational when he substantiated the whereabouts of his daughter and did not allow law enforcement to do its job. (Masters' Rep. at 42-43.) The Masters' further found:

> When Judge Pfaff was in the Snodgrass residence, Ashley Snodgrass was cooperating with him and his ex-wife. Judge Pfaff knew his daughter was with a person or persons voluntarily. Ashley Snodgrass told Judge Pfaff that [Respondent's daughter] had been there just a little while ago. There was no emergency. Judge Pfaff was not "saving" his daughter. She was in no immediate danger.

(Masters' Rep. at 43.)

After stating these mitigating and aggravating circumstances, the Masters unanimously recommended that Respondent be removed from office.

**Respondent's Resignation**

Two days after the Masters filed their Report, the Commission filed its Recommendation, *see* Admis. Disc. R. 25(VIII)(O), asking that the Masters' Report be adopted in its entirety and that Respondent be removed from office, deemed permanently ineligible for judicial office, suspended from the practice of law pending further order from this Court, and have all costs of this proceeding assessed against him.

Instead of contesting the Masters' Report and/or the Commission's Recommendation through a Petition For Review, *see* Admis. Disc. R. 25(VIII)(P), Respondent tendered his resignation to this Court. In his resignation, Respondent "apologize[d] to the young people who were involved in the events underlying the charges of misconduct which were brought against [him]," expressed "deep remorse[] for the negative impact [his] actions . . . had on all those directly involved," expressed "regret [for] the negative reflection of [his] conduct on [his] colleagues on the bench and at the bar," and stated he has "conscientiously performed [his] duties as Judge of [the] Elkhart Superior Court and regret[s] that [his] actions of[f] the bench have dishonored the office and system [he] value[s] so highly."

On November 21, 2005, we accepted Respondent's resignation by published order. In that order, we, among other things: (1) permanently prohibited Respondent from seeking or accepting any judicial office and from serving in any judicial capacity in Indiana; (2) assessed costs and expenses of this matter against him; (3) ordered that his suspension from the practice of law, *see* Admis. Disc. R. 25(III)(C); Ind. Const. art. 7, § 11, remain in effect until the costs assessed against him in this matter[2] are paid in full; and (4) stated that our order constituted a finding of professional discipline that would be required to be reported to other jurisdictions in which Respondent might seek admission as a lawyer. In re Pfaff, No. 20S00-0501-JD-14 (Ind. Nov. 21, 2005) (published order accepting resignation). As indicated in that order, we now issue this published opinion to document the circumstances surrounding Respondent's resignation.

---

[2] On the same day we issued our order accepting Respondent's resignation, we also issued an order taxing costs against him in the amount of $12,106.75. In re Pfaff, No. 20S00-0501-JD-14 (Ind. Nov. 21, 2005) (order taxing costs).

SHEPARD, C.J., and DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.