ATTORNEY FOR HON. KIMBERLY J. BROWN
Karl L. Mulvaney
Indianapolis, Indiana

ATTORNEYS FOR THE COMMISSION ON
JUDICIAL QUALIFICATIONS
Adrienne L. Meiring
Thomas M. Carusillo
Elizabeth Daulton
Indianapolis, Indiana



## In the
## Indiana Supreme Court

No. 49S00-1308-JD-560

IN THE MATTER OF:

THE HONORABLE KIMBERLY J. BROWN,
JUDGE OF THE MARION SUPERIOR COURT

JUDICIAL DISCIPLINARY ACTION

Hon. Viola J. Taliaferro,
Hon. Rebecca S. McClure, and
Hon. Sheila M. Moss,
Special Masters

**March 4, 2014**
Corrected on March 5, 2014

**Per Curiam.**

This matter comes before the Court as a judicial disciplinary action initiated by the Indiana Commission on Judicial Qualifications ("Commission") against Kimberly J. Brown ("Respondent"), Judge of the Marion Superior Court. Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give the Indiana Supreme Court original jurisdiction over this matter. After considering the evidence, the report of the Special Masters appointed in this matter, and the parties' arguments, we conclude that the Commission

has demonstrated, by clear and convincing evidence, that the Respondent engaged in significant judicial misconduct, and we conclude that the misconduct warrants her removal from office.

**Background**

From 2002 through 2008, the Respondent served as Judge of the Washington Township of Marion County Small Claims Court. Since January 1, 2009, she has served as Judge of the Marion Superior Court. From January 2009, through December 31, 2012, she was assigned to the Marion Superior Court's Criminal Division 16 ("Court 16"), where the docket consisted primarily of misdemeanor and D felony domestic violence charges. Effective January 1, 2013, the Respondent was assigned to Criminal Division 7 ("Court 7"), where the docket consisted primarily of misdemeanor cases.

After receiving an informal complaint, the Commission investigated and, on August 26, 2013, filed a Notice of Institution of Formal Proceedings and Statement of Charges, in forty-five counts, charging the Respondent with violations of the Code of Judicial Conduct, conduct prejudicial to the administration of justice, and a few acts of willful misconduct. The charges alleged mismanagement, delays, and dereliction of judicial duties on cases; display of an inappropriate demeanor, retaliation, and creation of a hostile environment for attorneys and others working in the court; failure to complete necessary paperwork and adequately train or supervise court staff, which resulted in delayed releases of defendants from jail; and failure to cooperate with members of the Marion Superior Court's Executive Committee to address the underlying issues that led to the delayed releases. The Respondent filed an answer to those charges and later amended her answer.

On September 27, 2013, this Court appointed three Judges to serve as Special Masters ("Masters") to receive evidence concerning the charges.[1] Thereafter, the Commission amended

---

[1] Masters hear and take evidence in a judicial discipline proceeding and report thereon to the Supreme Court, and their report may include a recommendation as to the discipline, removal, or retirement of the judge who is the subject of the proceeding. *See* Ind. Admission and Discipline Rule 25(VIII). Here, the

its charges to add two more counts, and the Respondent filed her answer to the additional counts. The Masters conducted a hearing November 4 through 10, 2013, during which the Commission called forty witnesses, and the Respondent called thirty-nine. More than 230 exhibits were tendered. At the conclusion of the hearing, the Masters allowed additional time to file proposed findings of fact and conclusions of law ("proposed findings"). The Commission filed its proposed findings on November 27, 2013.

The Masters granted the Respondent's request for additional time to file her proposed findings, but the Respondent did not submit proposed findings by the extended deadline. Instead, she later filed a Submission to Discipline in Lieu of Submission of Findings ("Submission"). In her Submission, the Respondent admitted most of the disciplinary violations alleged, apologized, and suggested as a sanction that she be suspended from office for sixty days. The Commission responded to the Submission.

On December 27, 2013, the Masters filed their 107-page Findings of Fact, Conclusions of Law and Recommended Sanction ("findings"). The Masters found that the Respondent committed judicial misconduct alleged in forty-six of the forty-seven counts, and they recommended that the Respondent be removed from office. On January 2, 2014, the Masters filed a supplemental report in which they rejected the Respondent's Submission and amended their findings to clarify that although they were recommending the Respondent's removal from judicial office, they were not recommending suspension of her license to practice law.

On January 3, 2014, the Commission filed a response to the Masters' findings and concurred in the recommendation for removal from office. On January 9, 2014, this Court issued

Court appointed the following three distinguished Judges as Masters. The Honorable Viola J. Taliaferro, retired Judge of the Monroe Circuit Court, has over three decades of experience as a practicing attorney, Judge, and Senior Judge, and her outstanding service to her community and to the State has been recognized with multiple honors and awards. The Honorable Rebecca S. McClure has served as Judge of the Boone Superior Court since 2006, and she previously served as the Assistant Director of the Indiana Prosecuting Attorneys Council and as a long-time prosecuting attorney. The Honorable Sheila M. Moss, who has served as Judge of the Lake Superior Court since 1993, has been a member of the Ethics and Professionalism, Court Management, and Special Courts Committees of the Judicial Conference of Indiana, and she previously served as a public defender and a deputy prosecutor.

an order suspending the Respondent from office on an interim basis pending the final disposition of this matter. *See* Admis. Disc. R. 25(V)(B). Next, the Respondent filed a verified petition and brief opposing removal and urging imposition of a sixty-day suspension. The Commission filed its reply brief. Accordingly, this matter is fully briefed and before this Court for a final decision.

**Discussion**

A judicial officer may be disciplined for, among other things, conduct prejudicial to the administration of justice and violation of the Code of Judicial Conduct. Ind. Admission and Discipline Rule 25(III)(A). The Commission bears the burden of proving judicial misconduct by clear and convincing evidence. Admis. Disc. R. 25(VIII)(K)(6). This Court reviews the Masters' findings *de novo*. Admis. Disc. R. 25(VIII)(P)(3).

The Respondent's petition for review acknowledges that her conduct, as set out in the Commission's charges, was prejudicial to the administration of justice and violated the Code of Judicial Conduct. And she does not argue that any particular findings made by the Masters were unsupported by the evidence or otherwise erroneous. Rather, she urges this Court to reject the Masters' recommended sanction and impose a sixty-day suspension. Before considering the appropriate sanction, however, we review the misconduct itself. We have reviewed the Masters' findings concerning the misconduct and hereby adopt and summarize them as set out below.

I.    Misconduct

a.  Mismanagement, Delays, and Dereliction of Duties

By creating an environment in which court files were difficult to locate, resulting in delays, the Respondent violated Rules 2.5(A)[2] and 2.5(B)[3] of the Code of Judicial Conduct and

---

[2] "A judge shall perform judicial and administrative duties competently, diligently, and promptly." Ind. Judicial Conduct Rule 2.5(A).

4

committed conduct prejudicial to the administration of justice. During her tenure in Courts 16 and 7, the Respondent failed to maintain court files and records in an organized manner that allowed access when needed. Case files were removed from the file drawers and often stored in the Respondent's secure office beyond the reach of others who needed to access them and without any indication of which files were being kept in the Respondent's office. The difficulty locating files was time-consuming and delayed the processing of pleadings and cases. The Respondent often blamed clerk's office employees for missing files that were later found in the Respondent's own office. Files relevant to the Commission's investigation were missing from the place in the Court 7 file drawers where they should have been when a clerk's office employee and others first looked for them. On one occasion, a commissioner and other court staff could not locate mental health evaluations for a hearing, and the Respondent had to be called in from elsewhere to locate them. On another occasion, the Respondent took possession of two exhibits entered as evidence in an attorney discipline hearing in 2012 in Matter of Joseph B. Barker, No. 55S00-1008-DI-429, and she lost those exhibits and was still unable to produce them more than one year after the hearing.

By delaying rulings and failing to complete paperwork necessary to effectuate court decisions, the Respondent violated Rules 1.2[4] and 2.5(A) of the Code of Judicial Conduct and committed conduct prejudicial to the administration of justice. Indiana Trial Rule 53.1 requires prompt rulings on motions, but the Respondent delayed ruling on many matters. She delayed ruling for nearly five months on the defendant's motion to dismiss in one case, delayed ruling for nearly five months on the defendant's motion for appointment of appellate counsel in a second case (which resulted initially in dismissal of that defendant's appeal), and delayed ruling for almost eleven months on the defendant's motion to suppress in a third case, prompting the State to file two motions for a ruling in the interim. In May 2009, a defendant filed a petition for

---

[3] "A judge shall cooperate with other judges and court officials in the administration of court business." Jud. Cond. R. 2.5(B).

[4] "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Jud. Cond. R. 1.2 (asterisks omitted).

post-conviction relief in Court 16, but the Respondent never ruled on it or set it for a hearing, and the matter was not addressed until a new judge took over that court in 2013. In 2012, the Respondent frequently took more than two months, and in some instances up to four months or more, to rule on motions for expungement and petitions to restrict access to arrest records. Further, the Respondent delayed for several weeks signing paperwork and orders in cases where a magistrate or commissioner had recommended a mental health evaluation to determine a jailed defendant's competency.

A trial court judge is duty-bound to carry out the orders of an appellate court. Matter of Newman, 858 N.E.2d 632, 635 (Ind. 2006). Yet, for nearly four months the Respondent delayed vacating the judgment of conviction on a criminal charge that had been reversed in Kelly Barngrover v. State, No. 49A02-1011-CR-1270 (Ind. Ct. App. July 8, 2011) (mem. dec.). The Respondent failed to vacate a judgment of conviction despite a reversal and remand for a new trial in Marcus Lewis v. State, 929 N.E.2d 261 (Ind. Ct. App. 2010), and that omission was not corrected until 2013 when a new judge was assigned to Court 16. Although the Court of Appeals reversed in part and remanded for a new restitution order in Damian Bailey v. State, No. 49A02-0907-CR-663 (Ind. Ct. App. Dec. 9, 2009) (mem. dec.), the Respondent did not vacate that restitution order or set the matter for a hearing; a new restitution hearing was not scheduled until a new judge was assigned to Court 16 in 2013. The Respondent delayed for more than one year in filing a written report to this Court in the attorney discipline case Matter of Joseph B. Barker, No. 55S00-1008-DI-429, despite reminders that her report was late; and even when she belatedly filed the report, she failed to address one of two rule violations that were alleged against Barker.[5]

The Respondent's practices related to continuances violated Rules 1.2 and 2.5(A) of the Code of Judicial Conduct and were prejudicial to the administration of justice. In Courts 16 and 7, the Respondent routinely failed to rule promptly on motions to continue a court setting and

---

[5] The Respondent's delay in filing her report in this attorney discipline matter also violates Rule 1.1 of the Code of Judicial Conduct, which requires that a judge "comply with the law[.]" *See* Admis. Disc. R. 23(14)(i) (requiring officer hearing attorney discipline matter to file a report with the Supreme Court within thirty days after the hearing's conclusion).

6

often would wait until the date of the hearing before ruling on the pending motion. And from 2009 through 2013, the Respondent had a policy of continuing bench trials if she believed the trials could not be completed by 4:00 p.m., even though many trials could have been completed the same day as scheduled. That policy caused multiple unnecessary appearances for attorneys, defendants, and witnesses. Some witnesses who appeared and were then informed they would have to reappear for the continued hearing simply failed to return, which caused the State to have to dismiss some cases.

In two cases, the Respondent continued hearings to announce rulings on matters taken under advisement, and the parties later appeared for the ruling, only to discover that the matter was being continued yet again, requiring an additional appearance. The Respondent unnecessarily continued several trials, purportedly due to lack of facilities, court staff, or judicial officers, although such facilities and personnel were available on the relevant dates and the defendants had requested a speedy trial. In another case, she refused the State's request to schedule the trial in a way that would accommodate the alleged victim's upcoming military deployment to Afghanistan; the State later dismissed the case due to the alleged victim's deployment-related unavailability, although the case could have been tried on a day before that deployment.[6]

b. Delayed Releases

Other misconduct by the Respondent resulted in ten Court 7 defendants not being promptly released from jail when they should have been. This misconduct violated Rules 1.2, 2.5(A), 2.12(A),[7] and 2.12(B)[8] and was prejudicial to the administration of justice. The ten

---

[6] Denying this alleged victim an opportunity to be heard under these circumstances violated the rule providing, "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Jud. Cond. R. 2.6(A) (asterisk omitted).

[7] "A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code." Jud. Cond. R. 2.12(A).

delayed releases occurred between January and July 2013. Three delays were of one day, one was of two days, two were of three days, one was of four days, one was of nine days, one was of sixteen days, and one was of twenty-two days. These delays resulted from the Respondent (1) failing to complete minute-entry paperwork showing that the defendant was being ordered released; (2) failing to train, instruct, and supervise the commissioner and other court staff to ensure they correctly filled out, and caught errors in, minute entries and updated court records; and (3) in one case, after being informed that the defendant had entered a diversion program agreement with the State, failing either to inquire regarding the defendant's ability to post bond or to complete paperwork to order the defendant's release on her own recognizance. Despite being alerted in late January 2013 to several of the delays, the Respondent did not inquire further or take any immediate action to ensure that court staff was correctly completing minute sheets and updating files, and a few more delayed releases occurred thereafter. She did not hold a staff meeting to address correcting such errors until late April or early May 2013, and, even after that, other delayed releases occurred.

### c. Inappropriate Demeanor, Hostility, and Retaliation

The Respondent's conduct toward other judges when the Marion Superior Court's Executive Committee learned of the delayed releases violated Rules 1.2 and 2.5(B) of the Code of Judicial Conduct. In March 2013, judges on the Executive Committee learned of delayed releases and investigated. When the Respondent found out about the investigation, she sent a discourteously phrased email message on March 8, 2013, to the judge who had alerted the Executive Committee. The Respondent stated that she had addressed the problem of delayed releases, that the problem was "rectified," and that she did "not appreciate being informed about this matter from a third party," the reporting judge should have informed her directly, and the

---

[8] "A judge with supervisory authority for the performance of other judges shall take reasonable measures to ensure that those judges properly discharge their judicial responsibilities, including the prompt disposition of matters before them." Jud. Cond. R. 2.12(B); *see* id. at cmt. 2 ("Public confidence in the judicial system depends upon timely justice.").

8

Respondent "expect[s] to be informed directly regarding such matters" in the future.[9] The Respondent sent a copy of that message to the judges on the Executive Committee.

The Executive Committee then requested that the Respondent fill vacant staff positions in Court 7 and reached out, in conjunction with the Marion Superior Court's Administration Office, to provide the Respondent's staff assessment and training; also, one of the Executive Committee members provided the Respondent a training manual. But the Respondent was initially uncooperative with these attempts to provide assistance, failed to ensure that staff received additional training, and failed to take adequate steps to fill the vacant staff positions.

The Respondent also treated some attorneys in a rude and discourteous manner, in violation of Rules 1.2 and 2.8(B)[10] of the Code of Judicial Conduct. On December 11, 2012, for instance, a supervisor from the prosecutor's office approached the Respondent to ask if there was anything the prosecutor's office could do to assist in obtaining a courtroom for an upcoming jury trial, and the Respondent replied in a rude and dismissive manner that the supervisor "could do whatever [she] wanted" but that it was up to the court to take care of the matter and that the parties would find out on the morning of trial.

The Respondent treated public defenders even worse. The Respondent's dissatisfaction with public defenders assigned to Court 16 began as early as 2009, when she asked supervisors in the public defender's office to reassign two public defenders from Court 16 because, according to the Respondent, they were "too adversarial," "extremely litigious," and not "aiding in the movement of cases." A court reporter, supervising public defender, and deputy prosecutors who observed the Respondent's statements and demeanor toward public defenders

---

[9] The statements of the Respondent quoted in this opinion are as they appear in the Masters' findings.

[10] "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control." Jud. Cond. R. 2.8(B).

9

between 2009 and 2013, variously characterized them as unwelcoming, "negative," "very hard," "chastising," or indicative of a "grudge."

On one day, for example, in 2012, the Respondent warned a public defender that he was disrupting the court and close to being held in contempt, although he had merely corrected the Respondent when she misstated the type of trial to be held during the next court setting. The same day, when a public defender in another case asked to make a record on the issue of court congestion and the defendant's right to speedy trial in a case that the court was continuing, the Respondent moved the matter to the end of the docket, instructed the bailiff and court reporter they could leave, and then left the bench without listening to the public defender's presentation. The Respondent also imposed informal administrative policies that applied only to public defenders; for example, public defenders had to file written motions for review of bond and no-contact orders, while private attorneys were permitted to seek the same review by oral motion.

The Respondent's misconduct relating to her ban of a deputy clerk from Court 16 violated Rules 1.2, 2.5(A), 2.5(B), and 2.8(B) of the Rules of Judicial Conduct and was conduct prejudicial to the administration of justice. The Respondent twice confronted the deputy clerk, at least once over whether she had blamed the Respondent for missing files. On October 7, 2011, the Respondent loudly and angrily ordered the deputy clerk out of Court 16's offices immediately and threatened to have the sheriff's deputies remove her when the deputy clerk tried to call her supervisors in the clerk's office. The deputy clerk never learned what caused the Respondent's behavior that day. For approximately six weeks thereafter, administrative delays resulted because the clerk's office did not have a replacement for the banned deputy clerk, pleadings for Court 16 cases had to be redirected elsewhere, and it became difficult for parties and attorneys to obtain certified copies of documents in files in Court 16. For approximately six weeks, the Respondent was unwilling to compromise with other court officials and clerk's office supervisors in resolving those problems.

By making derogatory and other inappropriate remarks to staff and treating staff discourteously and with hostility, the Respondent violated Rules 1.2 and 2.8(B) of the Code of

10

Judicial Conduct. From 2011 through 2012, the Respondent made the following derogatory comments, among others, in front of court staff. The Respondent crassly remarked about a particular deputy prosecutor's weight on several occasions, once quipping that the deputy prosecutor "should have used that law school money and gone to Jenny Craig instead." The Respondent expressed disbelief that one public defender had passed the bar, adding that he must have had "someone … supporting him behind the scenes" or words to that effect. She called one attorney a "moron" and another "a pain in [the] ass." She referred to a supervisor in the public defender's office as "evil," "very nasty," and "out to get certain people." Once in 2012, after a hearing involving a public defender, she walked into her office with a court employee and asked, regarding that public defender, "Can you believe that asshole, prick, dick, and did I mention he was an asshole?"

The Respondent had a practice in Courts 16 and 7 of favoring some court employees over others and keeping at least one employee as a confidant. She told some favored employees that she was suspicious of other employees, whom she described as "disloyal," "out to get" her, and not to be trusted. The Respondent made the following inappropriate comments, among others, to favored court employees about other employees: that one employee "wears her lesbianism on her sleeve," one was "ghetto fabulous," one would not have gotten her job "if it wasn't for her daddy," one was "classless" with a "felon" for a boyfriend and "into illegal things," and others were "crazy," mentally ill, or in need of increased medication. These comments made the employees who heard them uncomfortable. Whenever a favored employee disagreed with the Respondent's views or suggested she was being overly suspicious or critical, the Respondent stopped treating that employee as a confidant and asked that employee to return the judge's office key with which that employee had been entrusted.

The Respondent openly ignored disfavored employees, took away some of their job responsibilities, did not respond promptly to their requests for time off, and did not share information with them in advance regarding when the Respondent would be absent and other scheduling matters. The disfavored employees felt ignored, disliked, and insufficiently informed. After a commissioner working in Court 16 told the Respondent that she was

11

considering running for judge, her relationship with the Respondent deteriorated rapidly; the Respondent took away some of the commissioner's duties, talked with the commissioner much less, gave only curt answers to the commissioner's questions, and refused to discuss work performance issues with or give direction to the commissioner. On another occasion, while in Court 16, the Respondent pointed her index finger close to an employee and yelled, "This is my courtroom. I'm the presiding judge. We're going to run it my way." The Respondent's behavior made court employees timid and uneasy, and her treatment of employees caused five of them to cry.

Finally, the Respondent violated Rules 1.1 and 1.2 of the Code of Judicial Conduct by taking supervisory duties away from a chief bailiff and later terminating her employment because the Respondent believed that the chief bailiff had provided information to, or was going to file a complaint with, the Commission about the Respondent. Specifically, early in 2012, the Respondent heard from one court employee that the chief bailiff in Court 16 was putting together a complaint about the Respondent's conduct, and the Respondent then took away some of the chief bailiff's responsibilities. The Respondent then learned that someone had contacted the Commission regarding the Respondent, and when the Respondent asked who and whether it was a Court 16 employee, she was informed by the Commission's counsel that the information was confidential. Later that same day, the Respondent went to the Court Administration's Human Resources Director and informed her that she wanted to terminate the chief bailiff, although the Respondent had never before spoken with the HR Director about any problem or displeasure with the chief bailiff's work performance. The HR Director advised the Respondent against termination. The chief bailiff soon took a leave of absence under the Family and Medical Leave Act, but before she returned to work a few months later, the Respondent had the HR Director notify the chief bailiff that she was terminated. Later, the Respondent issued disciplinary warnings to two other employees, which the Masters found was retaliation for those employees cooperating with the Commission.

The use of judicial power as an instrument of retaliation is a serious violation of the Code of Judicial Conduct. Matter of Danikolas, 838 N.E.2d 422, 430 (Ind. 2005). Although the

Respondent later suggested job performance issues led to the chief bailiff's termination, she was unable during her deposition to specify what those performance issues were or to offer any written documentation of those issues or any evidence of verbal warnings to the chief bailiff before she was fired. Others familiar with the chief bailiff's work rated it highly.

II.   Sanction

Upon finding judicial misconduct, this Court may impose a variety of sanctions, including removal from office. *See* Admis. Disc. R. 25(IV). The purpose of judicial discipline is not primarily to punish a judge but to preserve the integrity of and public confidence in the judicial system and, when necessary, safeguard the bench and public from those who are unfit. Matter of Hawkins, 902 N.E.2d 231, 244 (Ind. 2009). Any sanction must be designed to discourage others from engaging in similar misconduct and to assure the public that judicial misconduct will not be condoned. Id. In determining whether the recommended sanction is appropriate, we consider any aggravating and mitigating circumstances before the Court. Matter of Boles, 555 N.E.2d 1284, 1289 (Ind. 1990).

The Respondent cites Boles, Danikolas, and Hawkins in urging this Court to impose only a sixty-day suspension. In Boles, a sixty-day suspension was imposed for misconduct arising out of two disputes: the judge's dispute with an attorney over fees in one case and the judge's retaliation therefor, and the judge's feud, in a political dispute, with county commissioners. 555 N.E.2d at 1285-89.

In Danikolas, we adopted the masters' recommended sixty-day suspension for the judge's (1) retaliatory discharge of a court employee after the employee failed to provide mitigating evidence for the judge during an earlier disciplinary proceeding, and (2) fallacious excuses to the Commission for the discharge. In mitigation, the Court took into account the judge's long career of public service and "multiple occasions on which he has added constructively to the Indiana judiciary." 838 N.E.2d at 431.

13

And in <u>Hawkins</u>, the judge was disciplined for seven counts of misconduct related to excessive delays in rulings on post-conviction relief petitions and for his failure to communicate promptly with the Commission regarding his discovery of a previously missing file relating to a case under investigation and regarding an order issued in that case. 902 N.E.2d at 240-43. In mitigation, the judge proved he had taken remedial steps to improve the court's handling of post-conviction petitions and that he had an outstanding reputation among attorneys and judges in the county for fairness, honesty, and integrity, proven in part by the testimony of character witnesses. <u>Id.</u> at 243.

The Respondent's misconduct in this case was more widespread and egregious than the misconduct at issue in <u>Boles</u>, <u>Danikolas</u>, and <u>Hawkins</u>.

Moreover, the Respondent acknowledges that no facts in mitigation on the question of sanction were presented to the Masters in her case. (Br. in Supp. of Pet. for Rev. at 6-7.) Her post-hearing Submission, agreeing that she engaged in most of the misconduct alleged by the Commission and apologizing for it, is entitled to little mitigating weight in light of its timing. The Submission was made after failing to cooperate fully with the Commission's investigation and putting the Commission to its burden of proof at a lengthy hearing. It is hard to assign much weight to an expression of remorse under these circumstances.

A judge investigated by a disciplinary agency has a duty to cooperate in the investigative process. <u>Matter of McClain</u>, 662 N.E.2d 935, 940 (Ind. 1996). In the present case, as found by the Masters, rather than fully cooperating, the Respondent ignored some of the Commission's requests for additional and clarifying information and provided untimely, incomplete, inconsistent, or unresponsive replies to others. She did not comply with the Commission's subpoenas for certain records. When the Commission deposed the Respondent on July 1 and August 1, 2013, the Respondent refused to take the oath to swear or affirm to tell the truth. During deposition questioning, she avoided answering some questions, and she gave

argumentative, evasive, or sarcastic responses to others.[11]  She dismissed some deposition questions as nonsensical, "silly," or "stupid."  She provided inaccurate information regarding her availability once it became necessary to continue and reschedule the deposition. The Respondent provided factually inaccurate information on several topics in her amended answer.  Before filing her Submission, the Respondent repeatedly eschewed responsibility for many mistakes and, instead, placed responsibility for the errors on others.

In Matter of Kouros, 816 N.E.2d 21 (Ind. 2004), this Court removed a judge from office for failing to issue orders promptly in criminal cases and for providing inaccurate information regarding her compliance with our orders requiring her to meet certain minimum standards for timely processing of cases. Even after a period of temporary suspension followed by reinstatement, the judge's office deteriorated into disorder and many rulings were delayed.  We listed significant aggravating factors, including that Judge Kouros was not a novice to the bench when the misconduct occurred, the misconduct was not isolated but included a persistent failure to perform judicial duties over a substantial period, the misconduct involved acts and omissions in the judge's official capacity, and it affected not only the parties but also others interested in the efficient operation of the criminal justice system.  816 N.E.2d at 30.  After balancing the circumstances, this Court concluded that "protecting the integrity of the judicial system and ensuring the fair and timely administration of justice require that [Judge Kouros] be removed from office."  Id. at 31.

Although not identical to an earlier case, this case most closely resembles Kouros in the scope and effect of the misconduct.  The Respondent was not a novice during the relevant period but had prior experience as a small claims court judge.  The misconduct occurred in the Respondent's official capacity.  It violated multiple Rules of Judicial Conduct, and much of it prejudiced the administration of justice.  It was not singular, isolated, or limited to a particular subset of cases or persons.  It was often repeated or continuing in nature.  This misconduct not

---

[11] For example, the Respondent's deposition answers included, "Why don't you just ask me if I retaliated against her and I can tell you no, I did not?"; "If you want to know whose handwriting it is, you figure it out"; and when asked what else she said during a conversation with the Commission's counsel, "I don't know. You tell me. What else did I say?"

15

only displayed a lack of dignity, courtesy, and patience required of judges, but it also negatively affected parties, court staff, and others interested in the efficient operation of the criminal justice system. Moreover, unlike in Boles or Danikolas, neither the Commission nor the Masters recommend mere suspension.

In arguing against removal from office, the Respondent attempts to distinguish her case from Kouros. Judge Kouros was removed from office after two administrative proceedings (including a period of suspension and monitoring by State Court Administration) designed to assist her in developing methods for issuing prompt rulings in criminal cases proved unsuccessful. But the misconduct in Kouros did not include delayed releases from incarceration, a circumstance that this Court finds particularly egregious. Nor did it involve the same combination of neglect of judicial duties, lack of judicial temperament, and malfeasance demonstrated in the Respondent's case.

Regrettably, the Respondent's pattern of neglect, hostility, retaliation, and recalcitrance toward investigating officials indicates an unwillingness or inability on her part to remedy deficiencies, alone or with others' assistance. And the record in the present case does reveal attempts by others to help. Most notably, the Marion Superior Court's Executive Committee tried to assist the Respondent in addressing the problem of delayed releases from jail, but the Executive Committee's involvement was met by the Respondent's hostility, noncooperation, and inaccurate representation that the problem had been rectified. On other occasions, the Respondent failed to work with other court officials, clerk's office supervisors, and a supervisor in the prosecutor's office who offered to help locate a courtroom for a trial. And, when the Commission later attempted to gather information about cases, the Respondent failed to cooperate fully and often presented untimely, incomplete, inconsistent, or unresponsive replies.

## Conclusion

We conclude that protecting the integrity of the judicial system and ensuring the fair and timely administration of justice require that the Respondent be removed from office. Therefore,

16

the Court hereby removes the Respondent from the office of Judge of the Marion Superior Court, effective immediately. This removal renders the Respondent ineligible for judicial office. *See* Admis. Disc. R. 25(III)(C). Although a judicial officer removed from office under such an order of discipline, "pending further order the Supreme Court, shall be suspended from the practice of law in the State of Indiana[,]" id., the Court hereby orders that the Respondent shall not be suspended or barred from practicing law in Indiana as a result of this removal from office. The Masters appointed in this case are discharged, and we thank them for their conscientious service in this matter.

Dickson, C.J., and David, Massa, and Rush, JJ., concur.
Rucker, J., concurs in part with separate opinion.

**RUCKER, J., concurring in part.**

Three very experienced and highly-respected trial court judges serving as Masters in this case have recommended that the Respondent be removed from office. The majority has accepted the Masters' recommendation and today orders Respondent's immediate removal. For reasons the majority expresses I agree that Respondent should be removed from the bench. However, I disagree the removal should be ordered effective immediately.

Removal from office of an elected judge is a drastic measure and the most severe sanction this Court can impose. With one exception, which I discuss in some detail below, absent agreement of the parties this Court has imposed such a sanction only twice in almost twenty years.[1] The common characteristic for this ultimate judicial sanction is conduct involving moral turpitude and willful misconduct in office.[2] See generally Matter of McClain, 662 N.E.2d 935 (Ind. 1996) (harassing court employee and family by following her, placing anonymous phone calls, and sending her vulgar letters including one containing a used condom); Matter of Drury, 602 N.E.2d 1000 (Ind. 1992) (soliciting loan from attorney and continuing to preside in his cases, soliciting loans from employees and family members which Respondent actively concealed, and attempting to retaliate against those who disclosed the loans totaling tens of thousands of dollars).

The forty-six counts of judicial misconduct alleged and proven by the Commission—all of which Respondent concedes she committed—essentially fall into two categories which can be characterized as: (1) mismanagement of judicial duties, and (2) unprofessional demeanor. Of the forty-six counts, the majority—thirty-two—fall in the former category and the remaining

---

[1] More recent removals from office were the result of agreements. See generally Matter of Moreland, 924 N.E.2d 107 (Ind. 2010) (agreeing to permanent ban from judicial service); Matter of Chapala, 902 N.E.2d 218 (Ind. 2009) (dismissing case as moot after respondent resigned from the bench and retired from the practice of law); Matter of Pfaff, 838 N.E.2d 1022 (Ind. 2005) (agreeing to resign from the bench and a permanent ban from judicial office); Matter of Kern, 774 N.E.2d 878 (Ind. 2002) (agreeing to resign from office with provision never to seek judicial office or serve in judicial capacity in Indiana); Matter of Edwards, 694 N.E.2d 701 (Ind. 1998) (accepting resignation and ordering permanent bar from judicial office and disbarment from the practice of law).

[2] None of the charges in this case involve acts of moral depravity; and the Commission did not allege and the Masters did not find that Respondent engaged in "willful misconduct in office." Admis. Disc. R. 25 III A(3).

fourteen in the latter.[3] Our reported decisions for judicial misconduct involving unprofessional demeanor show that the sanction generally imposed is a period of suspension. See, e.g., Matter of Harkin, 958 N.E.2d 788, 792 (Ind. 2011) (imposing sixty-day suspension for, among other things, making rude and improper statements to litigants); Matter of Young, 943 N.E.2d 1276, 1278, 1280 (Ind. 2011) (imposing thirty-day suspension for, among other things, making improper statements to litigants and attorneys); Matter of Cox, 680 N.E.2d 528, 529, 531 (Ind. 1997) (imposing thirty-day suspension for, among other things, advising a litigant that Respondent would apply a different sentencing guideline if the litigant were convicted after a jury trial than he would apply if litigant accepted a plea or a bench trial). In short, we have never removed a Judge from office for discourteous behavior.

On the other hand, "[o]ne of a judge's most critical responsibilities is to oversee his or her court's operation so all litigants are afforded their rights." Matter of Hawkins, 902 N.E.2d 231, 246 (Ind. 2009). In consequence this Court has removed from office a judge whose mismanagement of her judicial duties was so deficient that it demonstrated the judge was "either unable or unwilling to issue timely and documented decisions in the cases assigned to her, causing real-life consequences for those whose matters are in her hands." Matter of Kouros, 816 N.E.2d 21, 22 (Ind. 2004). It is Kouros with its similarities to the facts before us that compels me to conclude Respondent in this case should not be immediately removed from office; but rather should be afforded the opportunity to demonstrate that she has the capacity to manage her court.

In a seventy-eight count complaint the Commission in Kouros alleged and proved Respondent violated the Code of Judicial Conduct. The Commission also alleged and proved Respondent engaged in willful misconduct in office. And although the Canon violations in that case are not precisely the same as those alleged here[4] the overwhelming majority, as here,

---

[3] More specifically Counts 1 through 18 and 46 through 47 demonstrate delayed rulings on several cases; Counts 33 through 44 demonstrate a failure to train or adequately supervise court staff; and Counts 19 through 21, 23 through 32, and 45 demonstrate rude and discourteous behavior. See Findings of Fact, Conclusions of Law, and Recommended Sanction at 90-106.

[4] Specifically the Commission charged Respondent with violating the then-existing Canons 1, 2 and 3(B)(9) of the Code of Judicial Conduct. At the time, Canon 1 provided that a judge shall uphold the integrity of the judiciary, should participate in establishing and maintaining high standards of conduct and

2

involved Respondent's mismanagement of her judicial duties.[5]  But it is the events leading up to the filing of charges in <u>Kouros</u> that are relevant to the case before us.  In general, for a period of nearly two years Respondent, with the oversight of this Court's Division of State Court Administration, was given the opportunity to demonstrate she had the capacity to manage her court.  Only after a period of reporting by Respondent and oversight by the Division did it become apparent that Respondent lacked such capacity.

In condensed form the salient facts in <u>Kouros</u> are these.  Responding to a directive from this Court, in February 2001 Respondent reported that she had taken action to address delayed rulings on cases that had occurred in her court so that "the backlog dilemma should not occur in the future."  <u>Id.</u> at 23.  In January 2002 further inquiry was made concerning management of Respondent's court.  In October 2002 we directed the Division of State Court Administration to monitor Respondent's case processing and report to the Court.  Following a visit to Respondent's court the Division observed over 200 files for cases in which hearings or trials had occurred but no corresponding orders or CCS entries had been made.  <u>Id.</u> at 24.  Thereafter in January 2003 we entered an order which established minimum standards and a schedule for Respondent to follow in managing files in her court.  The order also directed Respondent to certify to this Court in a written report the specific actions she had taken to assure backlog problems were eliminated. <u>Id.</u> at 25.  In March 2003 Respondent timely filed her report certifying that the standards set out in the Court's order had been followed, would continue to be followed, and "every effort will be made to process cases in the manner outlined in this Court's order."  <u>Id.</u>  A month later the Division visited Respondent's court again and found, contrary to Respondent's earlier certification, numerous case files checked out from the clerk's office and several cases in which sentencing orders had not been timely issued.  After receiving an explanation for these

"shall personally observe those standards in order to preserve the integrity and independence of the judiciary."  Canon 2, which required a judge to avoid impropriety and the appearance of impropriety, provided in relevant part that a judge "shall respect and comply with the law[ ] and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary . . . ."  Canon 3(B)(9) provided that a judge "shall perform the duties of the judicial office diligently, including disposing of all judicial matters fairly, promptly, and efficiently."  <u>Kouros</u>, 816 N.E.2d at 28 (internal quotation marks omitted).

[5] For example Counts 1 through 35 involved the failure to issue sentencing orders promptly; Counts 37 through 49 involved delayed orders; and Counts 63 through 78 also involved the failure to issue sentencing orders promptly.  <u>Kouros</u>, 816 N.E.2d at 28-29.

transgressions, in June 2003 this Court found that "Respondent had failed to perform her duties without good cause and that significant improvement in the administration of her court had not been sufficiently demonstrated." Id. at 26. We therefore appointed a judge *pro tempore* to perform those duties "until Respondent's term ended or until Respondent became able to perform those duties." Id. We also left open the opportunity for Respondent to petition for reinstatement after ninety days.

In September 2003 Respondent filed such a petition declaring in part that during her suspension, she had conferred with fellow judges from around the State to learn more about operating a busy urban court, attended conferences on time and case management, and worked with the Division to learn how to manage her court. On December 12, 2003 the Court entered an order allowing Respondent to "resume her judicial duties based upon her conduct during the suspension and her assurances that she would manage her court effectively in the future." Id. As it turns out by March 29, 2004 "Respondent's office and bench were in a state of substantial disorder." Id. at 27. Among other things in numerous cases files and sentencing orders had not been timely returned to the clerk's office; there were signed orders dated weeks earlier with no file stamp; and orders dated weeks earlier with no signature. Id.

Despite persistent failure to perform her judicial duties over a substantial period of time, the Respondent in Kouros, with monitoring by the Division of State Court Administration, was given the opportunity to correct problems that ultimately led to the filing of disciplinary charges. The record here does not show any pre-filing intervention by the Division. And of course we are long past the point of charges being filed. But the question is whether the Respondent in this case has the capacity to (a) correct the systemic problems in her court that resulted in delayed rulings on several cases, see Counts 1 through 18 and 46 through 47, and (b) take necessary remedial measures to train and adequately supervise her court staff. See Counts 33 through 44.

In the papers submitted to us Respondent contends she indeed has taken specific steps to insure that delayed releases and untimely rulings will not happen again. And Respondent has outlined such steps with particularity. See Brown Affidavit at 4-5. The same is true with respect to the training and supervision of court staff. See id. But we need not be persuaded by

4

Respondent's self-report. Instead her asserted actions are easily verifiable and their results can be measured.

"The purpose of judicial discipline is not primarily to punish a judge, but rather to preserve the integrity of and public confidence in the judicial system . . . ." Hawkins, 902 N.E.2d at 244. Those ends can be met in this case by imposing an immediate 60-day suspension without pay[6] followed by removal from office; but removal stayed to one year of supervised probation monitored by our Division of State Court Administration. During the probationary period Respondent would carry the burden of demonstrating that she has the capacity to manage her court efficiently and effectively. A failure to do so would result in a probation violation and immediate removal from office.

This proposed sanction is both fair and equitable; would preserve the integrity of and public confidence in the judicial system; and is consistent with the treatment this Court afforded the Respondent in Kouros, a case that presented far more egregious facts than those that exist here.

---

[6] "Any suspension with or without pay is a sanction that most judges would regard as substantial. And a suspension without pay for more than a few weeks in most cases will be tantamount to a forced resignation." Hawkins, 902 N.E.2d at 249 (Boehm, J., dissenting).